IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ROBERT MOORE,<br>Plaintiff,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION, AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | EP-19-CV-00279-DCG |

**PLAINTIFF'S RESPONSE TO DEFENDANT CBP'S OPPOSED MOTION FOR *OPEN AMERICA* STAY AND EXTENSION OF FINITE PRODUCTOIN SCHEDULE**

Plaintiff, a local journalist, has waited thirty months to receive even one document responsive to his June 2018 Freedom of Information Act (FOIA) request (June Request) to U.S. Customs and Border Protection (CBP). He has waited twenty-four months to receive all responsive documents to his narrow November 2018 FOIA request (November Request). Plaintiff filed suit in this matter on October 1, 2019. [Doc. 1]. Only in the last two months has CBP invested any increased level of resources to respond to Plaintiff's requests. Yet, CBP now seeks what amounts to an indefinite stay of production and permission to continue acting as it has for the last thirty months without a deadline from the Court. Because "excessive delay by [an] agency in its response is often tantamount to denial," and because CBP has already demonstrated that it will not act without the Court's finite deadline, the Court should deny CBP's motion. H. Rep. No. 876, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. Admin. News. 6267 at 6271.

**FACTUAL BACKGROUND**

Plaintiff submitted two requests for information under the Freedom of Information Act (FOIA) to CBP – Request No. CBP-2018-064544 in June 2018 (June request) and Request CBP-

2019-010211 in November 2018 (November Request). [Doc. 1, Orig. Compl., ¶¶18, 42].[1] These were requests of urgent public concern. With regard to the June request, CBP did not conduct a search until after this lawsuit was filed.[2] Then, from February to November of 2020, CBP justified its inaction by parroting that it could not find "external hard drives, shared or other drives" to transfer responsive material to its FOIA office. [Doc. 35, Defs' Apr. 3, 2020 Status Report, p. 2].

The November request was a narrow request about a discrete incident in one place (El Paso) on one day (November 6, 2018). [Doc. 1, ¶42]. In particular, it sought information regarding a force demonstration on the day of a federal election a few blocks from voting locations.[3] In response, CBP conducted a broad search and failed to produce all responsive documents by November 2020. *Infra,* Sec. II(B).

In July 2020, Plaintiff moved for entry of a finite production schedule. [Doc. 46, Pl's Mot to Lift Stay]. On August 10, The Court ordered CBP to a finite production schedule – largely because CBP did not present the Court with any competent evidence to explain its lack of responsiveness. [Doc. 51, Mem. Order, p. 8-9]. The Court ordered CBP to complete its production by November 20, 2020. [*Id*]. For two months following the Court's order, CBP did nothing to respond to the Court's order to increase its production following the Court's August 10 order. *See,* [Doc. 59, Ex. 1, Decl. of Patrick Howard, ¶¶26-29] (outlining production and staffing to the November Request over this time period).

On the eve of the production deadline, CBP increased some of its resources to respond to Plaintiff's requests and filed this Motion for an Open America stay. [Doc. 59, Ex. 1, ¶¶28, 29].

---

[1] CBP admitted to both of these allegations in its answer [Doc. 15, Defs' Orig. Answer, ¶¶18, 42].

[2] The lawsuit was filed on October 1, 2019. [Doc. 1]. The Court ordered that the record search be completed by February 7, 2020. [Doc. 31, Order, p. 2].

[3] *See, e.g.*, Gina Martínez, *Border Patrol Cancels "Crowd Control Exercise" Planned for Election Day After Protests*, Time, Nov. 6, 2018, available at: https://time.com/5446227/border-patrol-cancels-election-day-exercise/.

Now, CBP seeks what amounts to an indefinite stay – seeking a stay to June 30, 2021 and "an extension beyond June 30, 2021" if it continues to exercise what it claims is "due diligence." [Doc. 59, p. 15]. CBP presents June 30, 2021 as a waypoint without any expectation of actually finishing production by that date. [Doc. 59, p. 14] (". . . it is unlikely that processing for both of Plaintiff's FOIA requests can be completed by said date . . .").

CBP has failed to utilize several simple methods to process the June Request over the last eleven months in at least a piecemeal fashion. Ex. A, Decl. of Kyle Campbell, ¶¶14-20. If it had exercised one of these alternatives, it could have completed the request in 175 days or earlier. *Id.*, at ¶23. Instead it sat on the data for eleven months. The agency's processing of the June Request does not constitute the exercise of due diligence under generally accepted standards. *Id.*, at ¶22.

With regard to CBP's November Request – of the estimated 60,600 pages of raw data that CBP pulled, CBP has reviewed only 19,805 pages of search responsive records and produced only 112 pages to Plaintiff. [Doc. 59, Ex. 1, ¶¶25-26]. CBP's response to this 24-month old request does not constitute due diligence under generally accepted standards of eDiscovery. *Id.*, at ¶32. CBP's review of search responsive documents from February to November 20 reflected only a 0.5% responsiveness rate. *Id.*, at ¶28. In other words, 99.5% of the raw data that has been searched thus far is not even responsive. CBP has not narrowed the search or conducted secondary filtering – as is customary. *Id.*, at ¶¶28-34. CBP has simply continued to do the same thing month after month – ensuring that the search will last far longer than it should. *Id.*

CBP must not be allowed to stay production without end after disregarding its obligations for 24 to 30 months. Plaintiff is certainly sympathetic to the impact of the COVID-19 crisis on agency staff – but the COVID-19 epidemic cannot be used as a blank authority to justify thirty months of inaction or to push off CBP's obligations under the FOIA for several years. As set forth

below, CBP: (1) has not met its burden of showing exceptional circumstances; and (2) has not exercised due diligence in conducting either the June or November 2018 search. For these reasons, CBP's Motion must be denied.

## ARGUMENT AND AUTHORITY

### I. LEGAL STANDARD

CBP seeks relief under a safety valve built into the FOIA that is only available in exceptional circumstances. This relief is called an Open America stay – so named after the decision in *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976). It is only meant to be available where an agency is "deluged with a volume of requests or information vastly in excess of that anticipated by Congress." *Id.* at 616.

The grounds for an Open America stay were later codified by Congress. Elec. FOIA Amendments of 1996, Pub. L. No. 104-231, § 7(c), 110 Stat. 3048 (codified as amended at 5 U.S.C. § 552(a)(6)(C)(ii)). To obtain relief, an agency has an evidentiary burden to establish each of the following elements: (1) Exceptional circumstances exist; <u>and</u> (2) the agency has "exercised due diligence in responding to the request." 5 U.S.C. § 552(a)(6)(C)(i).

An agency cannot establish exceptional circumstances based on ""a delay that results from a predictable agency workload of requests" <u>unless</u> "the agency demonstrates reasonable progress in reducing its backlog of pending requests." *Id.* at 552(a)(6)(C)(ii).

An agency cannot establish exceptional circumstances simply by the fact that it has a larger than usual number of requests – it must show that the requests were "truly unforeseen and remarkable." *Daily Caller News Found. v. F.B.I.*, 387 F.Supp. 3d 112, 116 (D.D.C. 2019).

### II. CBP HAS FAILED TO MEET ITS EVIDENTIARY BURDEN THAT ITS RESPONSE TO PLAINTIFF'S JUNE REQUEST SHOULD BE STAYED.

#### A. CBP fails to establish that exceptional circumstances exist to justify an indefinite stay

**of its June Request.**

CBP seeks to establish exceptional circumstances by conflating its predictable FOIA workload over the last several fiscal years with conclusory statements regarding the impact of the COVID-19 crisis. In fact, CBP's workload was predictable. CBP failed to establish how it has made reasonable progress in reducing its backlog. And CBP fails to present evidence how the COVID-19 crisis should justify an indefinite stay of production.

1. <u>CBP's increased workload is predictable.</u>

CBP first tries to establish exceptional circumstances by relying on its increased workload over the last five years. [Doc. 59, Ex. 1, ¶¶5-8]. To so find, CBP must prove that its workload was not one that was "in excess of that anticipated by Congress." *Buc v. Food & Drug Admin.*, 762 F. Supp. 2d 62, 67 (D.D.C. 2011), *as amended* (Feb. 24, 2011), citing *Open Am.*, 547 F.2d at 616 (internal citations omitted).

CBP admits, however, that its workload between FY2017[4] to FY2019 has been consistent and wholly anticipated with what it reported to Congress. CBP admits that it has received close to the same number of requests in each of the last three Fiscal Years – 2017, 2018, and 2019. [Doc. 59, Ex. 1, ¶6]. In fact, the number of requests has decreased from FY2017 to FY2019. [*Id*].

Moreover, CBP <u>anticipated</u> and projected to Congress the precise number of FOIA requests that it actually received in FY2018. CBP's funding request to Congress for FY2018 (made during FY2017) projected 80,000 requests for FY2018 – almost the same number of requests that Mr. Howard claims that the agency received in that year.[5]

---

[4] As CBP did in its brief, Plaintiff will refer to fiscal years – as opposed to calendar years – as "FY[YEAR]."

[5] CBP, *Fiscal Year 2018 Congressional Justification*, p. 168 (May 22, 2017), available at: https://www.dhs.gov/sites/default/files/publications/CBP%20FY18%20Budget.pdf. CBP apparently removed any information about FOIA requests from its budget requests for FY 2019 and FY2020 so there is no comparable data for those years. *See, generally*, CBP, *Fiscal Year 2019 Congressional Justification*

There is no evidence that the FOIA requests are unpredictable or unforeseen – it was the amount the agency projected to Congress for FY2018 and has remained the same since then.[6] "[A]ssuming that this aspect of [the agency's] workload was once unpredictable or unforeseen, it now appears to be routine." *Buc*, 762 F.Supp. 2d at 69.

During the same period of time from FY2017 to FY2019, CBP reports an increase in its backlog. From FY2017 to FY2018, the number of backlogged requests increased from 1,008 to 6,660.[7] From FY2018 to FY2019, the backlog increased from 6,660 to 10,466.[8] So while requests have plateaued and slightly decreased from FY2017 to FY2019, the agency has seen an increase in backlog over the same period of time. The increase in its backlog is not "truly unforeseen" as a result of COVID-19. *Daily Caller News*, 387 F.Supp. 3d at 116.[9] Rather, as stated above, CBP admits that delays have been building for some time while the overall number of requests has not increased for three years and has been in line with what CBP presented to Congress.[10]

---

(Feb. 9, 2018), available at: https://www.dhs.gov/sites/default/files/publications/U.S.%20Customs%20and%20Border%20Protection.pdf.

[6] This argument is not new. DHS component agencies have long invoked a lack of agency staff and resources to explain delays in responding to FOIA requests. *See, e.g., Elec. Priv. Information Ctr. v. U.S. Dep't of Homeland Security*, 811 F.Supp. 2d 216, 233 (D.C. Cir. 2011).

[7] Dep't of Homeland Security, 2019 Chief Freedom of Information Act Officer Report, p. 34 (Apr. 2019), available at: https://www.dhs.gov/sites/default/files/publications/2019_chief_foia_officer_report_april_2019.

[8] Dep't of Homeland Security, 2020 Chief Freedom of Information Act Officer Report, p. 37 (Mar. 2020), available at: https://www.dhs.gov/sites/default/files/publications/2020_dhs_chief_foia_officer_report_final.pdf.

[9] Mr. Howard also claims that the FOIA division's requests are "becoming increasingly more complex and voluminous" and that the backlog "principally consist[] of a large volume complex requests." [Doc. 59, Ex. A, ¶¶5, 7]. These conclusory statements fall "short of evidencing that incoming requests have, on average, become significantly and unexpectedly more complex as of late." *Buc*, 62 F.Supp. 2d at 68.

[10] Nor should CBP be able to shift the onus of its increased workload over the last four years onto Plaintiff, where the obligation to comply with the FOIA statute lies with it and, further, where its own policies may contribute to the growth of its workload. CBP notes an increase three years ago in FOIA litigation. [Doc. 59, Ex. 1, at ¶6]. This increase appears to be tied to unprecedented, harsh immigration policies issued by these same agencies which have drawn heightened scrutiny. Christine Mehta, *Annual Report: FOIA Lawsuits Reach Record Highs in FY 2018*, The FOIA Project (Nov. 12, 2018), available at http://foiaproject.org/2018/11/12/annual-report-foia-lawsuits-reach-record-highs-in-fy-2018/ (noting an

2. CBP has not established that it has taken reasonable steps to address its backlog.

Since CBP's workload is predictable, but its backlog has grown, CBP must next demonstrate that it has taken "reasonable steps" to address its backlog. 5 U.S.C. § 552(a)(6)(C)(ii). CBP presents to the Court no evidence of what steps it has taken to reduce this backlog over the last several years. Mr. Howard relies solely on a recent snapshot of its FOIA division size and a recent reallocation of some staff members to the litigation department of the FOIA division. [Doc. 59, Ex. A, ¶8]. *Cf, Elec. Frontier Found. v. Dep't of Justice*, 563 F.Supp. 2d 188, 193 (D.D.C. 2008) (finding reasonable progress in reducing a backlog where agency presented evidence of a new facility, new computer software, increased staffing for the agency, new electronic processing, and a temporary reduction in the backlog). This paragraph fails to show how CBP made changes to its staffing over the last three years in which it has seen an increase in its backlog. *See*, *Daily Caller News Found.*, 387 F. Supp. at 120 (finding no "reasonable progress" where there was an increase in backlogs while, at the same time, FOIA requests remain steady over the same period of time and defendant only made vague remarks of increased staffing).[11]

The reason for this omission, is, of course, CBP has not addressed its backlog. CBP has not sought money from Congress over the same fiscal years to confront an increased workload in the FOIA office. As mentioned above, CBP anticipated – in its request to Congress – the exact

increase in FOIA lawsuits against DHS agencies in light of the current administration's announcement of "controversial policies on a regular basis").

[11] Similarly, in *Gov't Accountability Project (GAP) v. U.S. Dep't of Health & Human Servs.*, HHS actually presented the court with proof that the backlog had been reduced over the previous five years and listed some steps that it had taken in the same time period. 568 F. Supp. 2d 55, 63 (D.D.C. 2008). The court in that case found that HHS had failed to establish "reasonable efforts" to reduce the backlog because HHS experienced a similar reduction in requests over the same period of time. *Id.* Therefore, HHS had not proven any reasonable steps were taken because there was no causative link between the agency's reduction in backlog and the steps it claimed to be taking. *Id*, citing *Bloomberg, L.P. v. U.S. Food and Drug Admin. (FDA)*, 500 F.Supp. 2d 371, 376 (S.D.N.Y. 2007). In contrast, here, CBP shows an increase in backlog over several years but provides only a snapshot of what its staffing levels are currently. If HHS's showing in *GAP* was not enough to show reasonable efforts to reduce the backlog, surely CBP's showing here is also insufficient.

number of FOIA requests that it actually received in FY2018. Yet, in CBP's request for FY 2018, FY2019, and FY2020, the Budget requests were silent on the need for additional funds for FOIA compliance.[12] CBP requested no money to address (nor expressed urgency regarding) the backlog in its FOIA office in any of these funding requests and failed to recognize that such a need existed.

During those same years, CBP's request for personnel in border security operations increased almost 10% from $4.5 billion to $4.9 billion.[13] *See, e.g., Bloomberg*, 500 F. Supp. 2d at 375 (finding that "reasonable progress" can be measured by requests for additional funding, updating technology, and or initiatives tied to backlog reduction).

An agency – particularly one with an $18.2 billion budget – should not be permitted to claim, on the one hand, that it should not be bound by the FOIA's timelines because of an increased backlog while, on the other, failing to address funding or staffing shortfalls that could help it reduce that backlog.[14] This is especially true when CBP anticipated the increase and when CBP has asked for and received significant increases in other areas of its budget.

Because CBP has provided insufficient evidence of reasonable efforts it has taken to address its growing backlog, it cannot justify a stay based on its workload.

3. <u>CBP does not present the Court with evidence that COVID-19 should justify an indefinite stay of production.</u>

Finally, CBP argues that COVID-19, "coupled with excessive workload" creates the

---

[12] *See, generally*, CBP, *FY2018 Congressional Justification*; CBP, *FY2019 Congressional Justification*; *and* U.S. Customs and Border Protection, *Fiscal Year 2020 Congressional Justification* (Mar. 8, 2019), available at: https://www.dhs.gov/sites/default/files/publications/19_0318_MGMT_CBJ-Customs-Border-Protection_0.pdf.

[13] This number was derived by comparing CBP's requested budget to Congress for program, project or activity (PPA) line item for Border Security Operations for FY2018 and comparing that to CBP's requested budget to Congress for PPA for Border Security Operations for FY2020. CBP, *FY2018 Congressional Justification*, p. 180; CBP, *FY2020 Congressional Justification*, p. 95.

[14] Congressional Research Service, *Comparing DHS Component Funding FY2020: In Brief*, p. 4 (Jan. 3, 2020), available at: https://fas.org/sgp/crs/homesec/R45972.pdf.

exceptional circumstances here. [Doc. 59, p. 9]. However, Mr. Howard's declaration only makes conclusory statements regarding how COVID-19 has affected the agency's work – alleging that the staff is teleworking and that this "initially overwhelmed CBP computer servers." [Doc. 59, Ex. A, ¶¶17, 24]. Mr. Howard provides very specific data regarding the agency's workload over the last several years, [*Id.* at ¶6], but provides the Court nothing beyond conclusory statements to explain how COVID-19 has impacted its workload or for how long the initial impact lasted. Nor does he provide the Court evidence of the backlog that was created from COVID-19. In fact, CBP seems to suggest that the impact from the pandemic has largely been resolved. [Doc. 59, p. 10].

Moreover, with regard to efforts to minimize the backlog, Mr. Howard merely parrots the statutory language, "The FOIA Division continues working to reduce its backlog." [*Id.* at ¶17]. This is not sufficient to establish why the agency's backlog continues to grow or how the agency is trying to gain control of its backlog. *See, e.g., Bloomberg*, 500 F. Supp. 2d at 375.

Plaintiff recognizes that, in its previous Order of August 10, the Court found that the COVID-19 crisis generally constituted exceptional circumstances in considering whether to allow the government additional time to produce responsive material. [Doc. 51, p. 5-6].[15] Of course, Plaintiff is sympathetic to the impact of the COVID-19 crisis. Plaintiff has encountered similar pressures as well. However, at this time – to support an Open America stay – CBP has an evidentiary burden to establish how COVID-19 both created an unforeseen workload over the previous nine months and what it has done to reduce that backlog. CBP simply fails to demonstrate

[15] Defendant was not moving for an Open America stay at the time of the August 10 Order and did not make any evidentiary showing in the briefing prior to the Order. Now that it is moving for an Open America stay, it has an evidentiary burden to establish the elements of the stay. 5 U.S.C. § 552(a)(6)(C)(i); *Buc*,762 F.Supp. 2d at 68 (noting the need for evidence to support government's showing); *Treatment Action Grp. v. Food & Drug Admin. & Dep't of Health & Human Servs.*, No. 15-CV-976 (VAB), 2016 WL 5171987, at *11 (D. Conn. Sept. 20, 2016) ("An agency requesting an *Open America* stay faces a high burden.").

that the COVID-19 crisis – which the FOIA division apparently has largely resolved, [Doc. 59, p. 10] – should justify the entry of an indefinite stay.[16] This is particularly true after Plaintiff has waited thirty months for a response – long before the pandemic ever hit the United States.

CBP has failed to establish exceptional circumstances to justify its stay of response to the June Request. For this reason, CBP's Motion should be denied.

**B. CBP has failed to exercise due diligence in response to the June Request.**

Even if CBP established exceptional circumstances, it must also demonstrate that it has exercised due diligence in responding to this June Request. Again, it has failed to do so.

For thirty months, CBP's handling of the June Request has involved "missed deadlines, unexplained timeline adjustments, and limited communication from the Government." *Bloomberg*, 500 F. Supp. 2d at 376. CBP failed to conduct a search for responsive documents for 20 months after the initial request. Then, as a result of this Court's order, CBP conducted a search for potentially responsive material. [Doc. 31, p. 4]. Yet, CBP has failed to process <u>even a small portion</u> of that data from February to the present. From February to October, it blamed its failure on one excuse: it lacked "available data space"; and couldn't find "external hard drives, shared or other drives." *See, e.g.*, [Doc. 35, Defs' Status Report, p. 2, Apr. 3, 2020; Doc. 37, Defs' Status Report, p. 2, May 4, 2020].

On August 10, 2020, this Court ordered CBP to produce all documents to Plaintiff by November 20. [Doc. 51]. Yet, from August 10 to November 20, CBP took no action to process a single portion of the raw data it uncovered in February 2020. Only in late November, almost ten months after it conducted the alleged search, does the agency present a different justification to

[16] Moreover, as outlined below in, *infra*, Sec. III(B), CBP and other DHS component agencies are capable of far more responsiveness than Defendant claims in its motion – even in the midst of the COVID-19 crisis.

the Court for not even starting a review of the search responsive documents – it claims that it does not have licensing space. [Doc. 59, Ex. 1, ¶35].

In reality, CBP does not argue that it exercised due diligence. Instead, it tries to justify its ten-month lack of inaction on a lack of licensing space or external hard drives. [Doc. 59, p. 10-11]. Its justification is baseless.

First, the FOIA division has had the capability of uploading less than 217 GB of data to Clearwell to begin processing at least a portion of its request and continue processing in a piecemeal fashion. Ex. A, Decl. of Campbell, ¶¶15-16. Alternatively, CBP could have run some of this data through Discovery Accelerator – allowing for a reduction in volume or facilitating secondary filtering. *Id.*, at ¶15-16. Instead, it simply sat on the data for ten months.

Second, if simple storage was the problem – there was nothing that prevented CBP from buying an external hard drive at a minimal cost to transfer the data. *Id*, at ¶20.

Under generally accepted standards of eDiscovery, CBP has failed to exercise due diligence in its response to the June Request. *Id.*, at ¶22.[17] CBP has sat on raw data – failing to process even a portion of it – for ten months.[18] For this to constitute due diligence would turn the standard on its head.

Finally, though CBP has been using the lack of hard drive space as a pretext for not processing any of its June Request, CBP only filed its Motion for Open America Stay on the day

---

[17] "[T]he increasingly well-developed caselaw on e-discovery searches is instructive in the FOIA search context . . ." *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 877 F. Supp. 2d 87, 109 fn110 (S.D.N.Y. 2012).

[18] The DHS FOIA office claims that this transfer problem stopped being an issue in 2019. "[A]s of August 2019, the FOIA Team upgraded its servers and was able to add additional electronic storage space [to receive transfers of electronic data]. According to a Privacy Office official, the FOIA Team is no longer having issues accepting responsive emails . . ." Office of Inspector General, "DHS' Process for Responding to FOIA and Congressional Requests," OIG-20-56 (July 23, 2020) p. 10, available at: _________________.

that the Court had ordered final production. This is also evidence that CBP has lacked due diligence in responding to the June Request. *See GAP*, 568 F.Supp. 2d at 64.

CBP has failed to establish that it has exercised any diligence in processing the June Request. Therefore, even if CBP identifies exceptional circumstances for a stay as it pertains to the June Request, the agency has failed to establish the due diligence prong of the Open America stay and its motion should be denied.

## II. CBP HAS FAILED TO MEET ITS EVIDENTIARY BURDEN THAT ITS RESPONSE TO PLAINTIFF'S NOVEMBER REQUEST SHOULD BE STAYED.

### A. CBP fails to establish that exceptional circumstances justify a stay of its response to the November Request.

CBP's argument that exceptional circumstances justify an indefinite stay of its response to the November Request is identical to the argument made to justify the stay to the June Request. For the reasons stated in, *supra*, Sec. I(A), CBP has failed to establish exceptional circumstances and its request should be denied.

### B. CBP has not exercised due diligence in response to the November Request.

CBP has failed to exercise due diligence in responding to the November Request. Plaintiff's request was not overly broad – seeking a five-week period of communications regarding one incident in one place (El Paso) on one day (November 6, 2018). [Doc. 1, ¶42]; Ex. A, ¶25.

Yet, CBP again failed to respond to the request until this lawsuit was filed a little over a year ago. In January 2020, CBP characterized the request as overly broad – though it never communicated that determination to Plaintiff. [Doc. 59, Ex. 1, ¶25]. Instead, CBP proceeded to collect somewhere around 63,600 pages of search responsive records. [*Id.*, at ¶26].

Since February, CBP processed these records at a rate of only 816 pages per month from

February to September and produced only 59 pages of records – a .9% responsiveness rate.[19] In this period of time, CBP did nothing to refine the search as required under generally-accepted eDiscovery practices. Ex. A, ¶¶29-34.

In October – two months after being ordered to produce documents by November – the agency increased some of its resources to respond to the November request – but its responsiveness rate for October actually declined to 0.4%. [[Doc. 59, Ex. 1, ¶25]. The overall responsiveness rate from February to November is only 0.5%. [*Id*]. This responsiveness rate is abysmal and demonstrates a lack of diligence to complete the search in a reasonable time period. Ex. A, ¶32.

The Court must judge CBP's due diligence to the entire period of the search period – not just what it has decided to do at the last minute. Again, there is no due diligence when the Court is presented with "missed deadlines, unexplained timeline adjustments, and limited communication from the Government." *Bloomberg*, 500 F. Supp. 2d at 376.

Here, Plaintiff submitted a request for 42 days of correspondence regarding one event in November 2018. After twenty-four months, a lawsuit being filed, and this Court's order of August 10, 2020, CBP still failed to increase resources to respond to the November Request until October 2020. This Court ordered CBP to produce all responsive documents by November 20, 2020. [Doc. 51, p. 9]. Yet, it was not until October 2020 that CBP committed to dedicating one employee to deal with this request and November 23, 2020 that CBP commits to dedicating a second employee to deal with its backlog on this request. [Doc. 59, Ex. 1, ¶¶28-29]. Nor has CBP ever made any effort to narrow its overly broad search to a narrow request. Ex. A, ¶¶29-34. *See also*, *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 109.

Therefore, from November 2018 to November 2020, despite last-minute attempts to

---

[19] This rate was calculated by adding the number of pages produced during this time period and dividing that amount by the number of pages reviewed. *See* [Doc. 59, Ex. 1, ¶26].

address the delayed response, CBP has failed to exercise due diligence in responding to Plaintiff's request. For this reason, CBP's motion for stay as to the November Request should be denied.

## III. CBP'S PROPOSED PRODUCTION SCHEDULE SHOULD NOT BE GRANTED; THE COURT SHOULD ENTER A PRODUCTION SCHEDULE WITH FINITE END DATES.

Finally, regardless of whether the Court finds that exceptional circumstances exist to justify a stay, the Court should not permit CBP a stay of production without end. Even if the Court finds a stay is warranted, it is not bound to abide by CBP's requested time period.[20]

Plaintiff recognizes that, even if CBP's predicament is its own making, the agency is still in a predicament. It may not be possible at this point for the agency to produce all documents in a week's time. However, CBP must not be rewarded for sitting on these requests for thirty months while, in the case of the June Request, not even trying to start a review of search responsive records for the last ten months.

Plaintiff has expressed his willingness to work with CBP to narrow the search responsive documents for the November Request and would agree to a stay with a reasonable finite end date. However, CBP ignored Plaintiff's offer and instead seeks a nebulous stay.

The history of this case has shown that CBP will not take meaningful steps to finalize its responses unless this Court provides a finite production schedule. For this reason, Plaintiff recommends the following production schedule – based on the expert advice of Kyle Campbell.

### A. June Request.

For the June Request, CBP has not provided the Court with any estimate as to when it will

[20] *See, e.g. Bower v. F.D.A.*, No. Civ. 03-224-B-W, 2004 WL 2030277, at *3 (D. Me. Aug. 30, 2004) (approving seven-month stay, rather than leaving FDA "to its own, unmonitored devices" for full two-and-one-half-year period that it had requested); *Ruiz v. U.S. Dep't of Justice (D.O.J.)*, No. 00-0105, slip op. at *3 (D.D.C. Sept. 27, 2001) (acknowledging that agency made "a satisfactory showing that a stay . . . is warranted," but reducing the stay's length from requested thirty-three months to only seven months).

have the storage space to even begin processing search responsive documents. However, as outlined above, it could have started processing search responsive documents ten months ago. With two attorneys, and using the alternatives set forth in Kyle Campbell's affidavit, CBP should be able to finalize its review of the search responsive records between 87.5 and 175 days. Given the extreme delay and lack of due diligence as to this Request, the Court should order CBP to finalize production in response to this request by March 31, 2021.

**B. November Request.**

For the November Request, CBP states that it will not be able to process more than 5,000 pages per month – despite the fact that it reviewed over 13,000 pages in October. [Doc. 59, Ex. 1, ¶26]. Its sister DHS component agency, Immigration and Customs Enforcement, has committed – in a separate case in this Division – to processing 250,000 to 300,000 pages of search responsive records between November 27, 2020 to March 31, 2021. Ex. B, Decl. of Fernando Pineiro, ¶35, Nov. 27, 2020. This constitutes an average of 62,500 to 75,000 per month. ICE only had a $7.6 billion budget in FY2019 – less than half that of CBP.[21] Therefore, CBP surely has the capacity to review more than 5,000 pages per month.

Moreover, if CBP conducts secondary filtering – as is customarily done – the need to review so many pages would be vastly reduced. Ex. A, ¶¶28-33.

A finite deadline will encourage CBP to find alternative ways to narrow its search and Plaintiff remains available to coordinate with CBP in this endeavor. To ensure completion, the Court should order CBP to finalize production in response to this request by March 31, 2021.

---

[21] Exec. Office of the President, *Border Security 2020 Budget Fact Sheet*, p. 1, available at: https://www.whitehouse.gov/wp-content/uploads/2019/03/FY20-Fact-Sheet_Immigration-Border-Security_FINAL.pdf (last accessed on Dec. 7, 2020).

## CONCLUSION

Conduct repeated is conduct rewarded. After 30 months of non-responsiveness, including after this Court ordered a finite date for production, CBP has failed to comply with its obligations under the FOIA. It should not be rewarded for that conduct by now claiming that it needs an indefinite stay. Plaintiff respectfully requests that the Court deny CBP's motion and enter a renewed but definite production schedule as outlined above.[22]

Respectfully submitted,

THE LAW OFFICE OF LYNN COYLE, PLLC
2515 North Stanton Street
El Paso, Texas 79902
(915) 532-5544
Fax (915) 532-5566

*/s/ Christopher Benoit*
LYNN COYLE
Texas Bar No. 24050049
lynn@coylefirm.com
CHRISTOPHER BENOIT
Texas Bar No. 24068653
chris@coylefirm.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

[22] In the alternative to a denial of the stay, Plaintiff requests that the Court grant leave for Plaintiff to conduct an organizational deposition under Fed. R. Civ. P. 30(b)(6) or, the absence of deposition testimony, an evidentiary hearing. The information raised in this Response – if not conclusive – certainly calls into question a factual dispute as to the information included in Mr. Howard's affidavit. This factual dispute merits an organizational deposition under Fed. R. Civ. P. 30(b)(6) regarding the topics raised in Mr. Howard's affidavit. *See, e.g., Citizens for Resp. & Ethics in Washington (CREWS) v. U.S. D.O.J.*, No. CIV. 05-2078(EGS), 2006 WL 1518964, at *3-5 (D.D.C. June 1, 2006), citing *Pub. Citizen Health Research Grp. v. F.D.A.*, 997 F.Supp. 56, 72-73 (D.D.C. 1998) (finding that discovery was appropriate where the government's own statistics impugned the government's affidavit testimony regarding an extreme delay in response). *See also, Scudder v. C.I.A.*, 25 F.Supp. 3d 19, 52 (D.D.C. 2014) (ordering limited discovery or, in the alternative, an evidentiary hearing); *Landmark Legal Found. v. E.P.A.*, 959 F.Supp. 2d 175, 184 (D.D.C. 2013) (ordering limited discovery).

I hereby certify that on the 7th day of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants: Manuel Romero, *Attorney for Defendants*.

/s/ Christopher Benoit
CHRISTOPHER BENOIT

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ROBERT MOORE,<br>Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | EP-19-CV-00279-DCG |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION, AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§ | |

**DECLARATION OF KYLE R. CAMPBELL**

I, Kyle R. Campbell, declare as follows under 28 U.S.C. § 1746:

1. I am a Vice President of Litigation Support Services for LogicForce Consulting, who has been retained by The Law Office of Lynn Coyle, PLLC as a technology consultant in this matter. I am over eighteen (18) years-of age and have personal knowledge of the contents set forth herein.

2. My experience and qualifications to serve in the role of technology consultant are outlined in the Curriculum Vitae attached as Exhibit A-1.

3. Of particular note, I am an expert in both technology and practices for large-scale collection and processing of eDiscovery for large organizations.

4. I have provided eDiscovery support for law firms and corporate organizations with tens of thousands of employees spread throughout the globe. I have provided eDiscovery support for companies as large as Eli Lilly and Company – the world's largest distributor of psychiatric medications.

5. I also regularly provide eDiscovery support for large public institutions – such as the University of Tennessee – in collecting electronically-stored information to respond to public information requests.

6. I have reviewed Customs and Border Patrol's (CBP) Opposed Motion for *Open America* Stay filed with the Court on November 20, 2020. I have also reviewed the declaration of Patrick Howard.

7. I have also reviewed all production letters and status updates received by Plaintiff from CBP from February 2020 to the present.

8. I have also reviewed the 112 pages of documents that were produced from February to October 2020.

9. I have also conducted an independent review of budget analyses for DHS, CBP, and other sister agencies. I have also reviewed the Office of Inspector General's document titled "DHS' Process for Responding to FOIA and Congressional Requests" published in July 2020.

10. Based on my review and my experience, I have come to the following opinions. I have reached these opinions utilizing the generally accepted standards for eDiscovery in the United States.

**Request No. CBP-2018-064544 (June Request)**

11. CBP has used the blanket position that it is unable to find "external hard drives, shared or other drives" in all of its status updates from February until November 2020.

12. In his declaration, Mr. Howard states that CBP does not have enough space on its Clearwell system – the primary tool that it uses to conduct search strings of raw data and to process document review. My opinion is that "processing space" is not the proper way to think of this –

CBP has purchased a data allocation for processing, and it deducts from that allocation when data volumes are processed through the Clearwell system.

13. Mr. Howard specifically states that CBP has 8.5 Terabytes of processing licenses on Clearwell. He states that there are 217 GB of processing licenses available at the time of his declaration. He claims that the raw data collected by a third party of potentially responsive documents is 287 GB. He states that the eDiscovery team cannot upload the 287 GB to Clearwell because it exceeds the 217 GB in available licenses. Mr. Howard states that he estimates that these search responsive records amount to 90,000-150,000 pages contained in 520 files. Generally-accepted eDiscovery metrics give a rule of thumb that there are usually an estimated 3.5 pages per document, Therefore, the search responsive records consist of approximately 26,000-43,000 documents.

14. Based on the information provided and the budget information that I have reviewed, it is my opinion that CBP can easily remedy any limitation of drive space.

15. First, even if the eDiscovery team only had 217 GB left, there is nothing that would prevent the eDiscovery team from uploading a portion of the 287 GB in raw data to Clearwell and processing it at one time. In other words, from February to the present, the eDiscovery team could have conducted the search piecemeal. Clearwell would allow the eDiscovery team to upload 100 GB of the 287 GB in raw data, process it, and then upload an additional 100 GB.

16. Nor is it explained how or why the FOIA Division has not had drive space in the entire period between June 2018 to November 2020. Mr. Howard identifies the licensing space that the FOIA Division has at the time of his declaration – in November 2020. But he does not explain how a lack of drive space would have prevented the FOIA Division from transferring this data to the FOIA Division in the last two and a half years.

17. Second, Clearwell is a program that is sold by pricing points. It allows its clients to use its search tools but only for data that is ingested to Clearwell, and its volume is subsequently deducted from the organization's total allocation of 8.5 Terabytes. To the best of my knowledge, Clearwell does not prevent its clients from exceeding the data space allotted to them per license. Its search tools come with a set amount of data allocation per license. But, if a client goes over that amount, they can be charged pro rata for the amount – there is nothing within the system itself that will block further ingestion if an organization's data allocation is exceeded. CBP fails to explain why it cannot simply transfer the full 287 GB to Clearwell and pay for additional processing space on a pro rata basis while it processes that data.

18. Mr. Howard also makes no indication that CBP has attempted any searching in its Discovery Accelerator system. His only reference to the system is that it does not allow for the same level of complexity in search construction as compared to Clearwell's search capabilities.

19. In my professional opinion, any measure of searching can still be processed within Discovery Accelerator and would likely reduce the initial 287 GB of search responsive data. Or, even if it did not reduce that data volume, some initial insights to the data could have been garnered through Discovery Accelerator – enough, at least, to determine what kinds of documents had been identified, and what particular features in Clearwell's search utilities would be best to further refine this data set for review by CBP.

20. Finally, Mr. Howard still appears to state in paragraph 35 of his declaration that the FOIA division is looking for other external hard drives to transfer the file. If that is the limitation, there is nothing to prevent an organization of the size of CBP from purchasing a terabyte external hard drive at a price range of <u>$20 - $100</u> from any provider to transfer the data over to the FOIA division.

21. Based on my review of these materials, my opinion is that CBP has various reasonable and low-cost options both within Discovery Accelerator or Clearwell, and to find adequate storage for transferring its data.

22. Based on generally accepted standards of eDiscovery, CBP has not exercised due diligence in processing and responding to the June Request. In particular, it is inexplicable how CBP has not even been able to process at least a portion of the June Request thirty months after the request was made. As explained above, there are various options that were available to CBP to start processing the potentially responsive documents long before November 2020.

23. Using generally-accepted eDiscovery metrics of 3.5 pages per document, CBP's estimated 90,000-150,000 pages would amount to approximately 26,000 – 43,000 documents. Taking the average of that range and estimating approximately 35,000 documents and further using an industry standard of 20-30 documents per hour reviewed by an attorney, it would take approximately 1400 hours to review that document set. Assuming an 8 hour work day, a single attorney should be able to review that amount of documents in 175 days. Thus, had CBP done nothing else to reduce this data volume in either Discovery Accelerator or Clearwell, I estimate that a reasonable period of time to review this with one attorney dedicated to the document review would be 175 days. That number would be cut in half if two attorneys are allocated to this request and, of course, even further if proper filtering is done with Discovery Accelerator or Clearwell.

**Request No. CBP-OFO-2019-010211 (November Request)**

24. I separately reviewed the allegations that have been made regarding CBP's response to the November Request and have reached an opinion regarding this search.

25. First, this request would not be considered overly broad under generally accepted eDiscovery standards. This is a request limited to communications regarding a specific incident on November 6, 2018. This request is also limited to a five-week period.

26. CBP claims that it has identified – since February 2020 – 8,358 documents of search responsive records (an estimated 63,600 pages of records).

27. Yet, as of November 20, 2020, it reviewed 19,805 pages of search responsive records and only produced 112 pages of records.

28. This puts CBP's responsive rate at 0.5%.

29. It is unacceptable under generally acceptable eDiscovery standards that such a large amount of search responsive records would be reviewed with such a low responsive rate. A reasonable eDiscovery specialist would immediately begin narrowing the range of the request to ensure higher responsiveness from the documents.

30. Nothing in Mr. Howard's declaration or in the status updates indicates that any of this secondary filtering is occurring. It appears that CBP has just decided to review the very large amount of search responsive documents without modification in the same way that it was reviewing it in February 2020. This practice almost ensures that the search will extend much longer than it needs to.

31. As of November 2020, CBP is committing another staff person to respond to this request. However, without higher level refinement or filter of the search, they are putting good money after bad. They would not need another staff person if they used secondary filtering.

32. Under generally accepted practices of eDiscovery and considering the monetary resources available to the CBP as an organization, CBP's response to the November Request is

not being conducted with due diligence. The request was narrow but the search was overbroad and there is no evidence that CBP ever attempted to filter its data.

33. For example, of the 112 pages of documents produced through October 2020, most of the documents appear to be coming from custodians outside of El Paso – despite the fact that the request focuses on an incident that happened in El Paso on a specific date. An appropriate eDiscovery method for processing this large amount of data in an agency as big as CBP would be the following: First, focus on custodians in the El Paso sector and begin production based on those custodians. Second, after reviewing custodians in the El Paso sector, the eDiscovery specialist would run a series of search terms against the initial search responsive documents to generate search term reports. Third, the specialist would reconfigure its searches for the remaining data to filter out unresponsive material and ensure a quicker search. The eDiscovery specialist would want to reconnect with the requestor to ensure that the search is properly narrowed.

34. Secondary filtering of search responsive documents is possible and available to the FOIA Division based on the fact that the FOIA division already uses Clearwell and Discovery Accelerator. Clearwell, in particular, is fully capable of handling secondary filtering.

35. I have been hired by Mr. Moore to provide my opinion in this case at a rate of $200 per hour. Thus far, I have not invoiced Mr. Moore, nor have I been paid to date, for this work.

36. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this the _7th_ day of __December__________, 2020.

DocuSigned by:
Kyle Campbell
889CE07A0195497...

Kyle R. Campbell

# EXHIBIT A-1

# *Curriculum Vitae*

Kyle R. Campbell
Vice President of Litigation Support Services at **LOGICFORCE**
1201 Demonbreun Street, Suite 930
Nashville, TN 37203
Phone: 675-238-2383
Email: kcampbell@logicforce.com

**SUMMARY**

- 22 years of eDiscovery professional experience
- Experience with all phases of EDRM – from information governance to courtroom presentation
- Multitude of eDiscovery certifications and skills honed with hands-on involvement in various matter types and clients

**WORK EXPERIENCE**

*LogicForce Consulting, LLC; Nashville, Tennessee*
*VP of Litigation Support Services; May 2016 to Present*

- Started as eDiscovery Project Manager, promoted to Director of eDiscov and then VP of Litigation Support Services overseeing eDiscovery and D Forensics operations
- Lead digital forensics and eDiscovery projects
- Manage forensics and eDiscovery teams
- Maintain on-site presence with client law firm in Indianapolis, operating as in-house Litigation Support Specialist
- Consult directly with case teams and their clients to facilitate defensible eDiscovery practices

*Akin, Gump, Strauss, Hauer & Feld; San Antonio, Texas*
*Senior eDiscovery Project Manager; May 2010 – June 2012*

- Manage all phases of eDiscovery matters' lifecycles
- Work with firm General Counsel on all eDiscovery-related issues in subpoena responses and suits against the firm
- Double the head count of the San Antonio office eDiscovery team and overall revenue generation

*Baker & Daniels (now Faegre Drinker); Indianapolis, Indiana*
*Litigation Support Analyst; October 2005 – May 2010*

- Implement and deploy firm's iCONECT hosted review solution
- Develop case management SOPs related to eDiscovery matters
- Consult directly with case teams and their clients to facilitate defensible eDiscovery practices

**FORMAL EDUCATION**

*Bachelor of Science in Political Science*
Indiana University – Bloomington, May 1998

**CERTIFICATIONS & PUBLISHED ARTICLES**

*Certified eDiscovery Specialist (CEDS)*
Association of Certified eDiscovery Specialists, 2012 to Present

*Relativity Certified Administrator and Certified User*
Relativity; October 2016 to Present

*iCONECT Xera Certified Administrator and Project Manager*
iCONECT; December 2016 to Present

Guide for Successful E-Discovery Matter Lifecycle Execution
Legal Intelligencer/Law.com, 2020

E-Discovery's Evolution: Critical Implications for Law Firms, Providers
Legal Intelligencer/Law.com, 2019

Future of Lit Support Portends Lean Times for Unskilled in E-Discovery
ACEDS.org, 2014

**TESTIFIED IN CASES IN LAST FOUR YEARS**

*UNIVERSAL STRATEGY GROUP, INC., Plaintiff, v. BRIAN D. HALSTEAD, Defendant. Case Nos. 16-15-BC and 17-0136-BC* (Chancery Court for State of Tennesee, Twentieth Judicial District, Davidson County).

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **DIOCESAN MIGRANT** | **§** | |
| **& REFUGEE SERVICES, INC.** | **§** | |
| | **§** | |
| **Plaintiff,** | **§** | |
| | **§** | |
| **v.** | **§** | **No. EP-19-CV-00236-FM** |
| | **§** | |
| **UNITED STATES IMMIGRATION** | **§** | |
| **AND CUSTOMS ENFORCEMENT** | **§** | |
| | **§** | |
| **Defendant.** | **§** | |

**DECLARATION OF ICE DEPUTY FOIA OFFICER FERNANDO PINEIRO**
**REGARDING ICE FOIA OFFICE WORKLOAD AND RESOURCES**

## I. INTRODUCTION

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Acting FOIA Officer of the U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act ("FOIA") Office. I have held this position since July 10, 2019 and am the ICE official immediately responsible for supervising ICE responses to requests for records under the FOIA, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access statutes and regulations. Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013 to July 9, 2019, and prior to that I was the FOIA Officer for three years at the Office for Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS").

2. My official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office, which is responsible for the receipt, processing, and response to all FOIA and Privacy Act requests received at ICE. In that capacity, I manage and

supervise a staff of total of 32 people, including FOIA processors, supervisors, intake processors along with litigation team paralegals. ICE FOIA Paralegal Specialists, who report to me regarding the processing of FOIA and Privacy Act requests received by ICE, as well as the status, processing, and productions of ICE's federal FOIA litigations. In connection with my official duties, I am familiar with ICE's procedures for responding to requests for information pursuant to provisions of FOIA and the PA. In addition to responding to requests for information, I am also familiar with ICE FOIA's workload as well as the supporting metrics.

3. I make this declaration in my official capacity based on my personal knowledge, my review of records kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties. The statements contained in this declaration are in support of ICE's Motion for an Extension of Time to review and process records pursuant to Court's November 3, 2020 order.

## II. CURRENT STATISITCS REGARDING FOIAS SUBMITTED TO ICE

4. As of the date of this declaration, the ICE FOIA Office is processing approximately 36,010 open FOIA requests. Of those open FOIA requests, 3,604 requests are original requests submitted to the ICE FOIA Office, 154 are consults, and 32,252 requests are a referral backlog from the U.S. Citizenship and Immigration Services ("USCIS").[1]

5. Beginning in fiscal year ("FY") 2018, the ICE FOIA Office experienced a substantial and dramatic increase in the number of FOIA requests received by ICE compared to previous years. In FY 2015, the ICE FOIA Office received 44,748 FOIA requests; 63,385 FOIA

[1] Other Federal agencies may send FOIA requests to ICE for either consultation and/or referral. These consultations and referrals require a significant amount of work by ICE FOIA, as they must be treated like a normal FOIA request and require either a response back to the originating agency or a direct response to the requester.

requests in FY 2016; the number of requests received decreased in FY 2017 to 47,893 but was then followed by a record high of 70,267 FOIA requests in FY 2018. In FY 2019, that number increased even further to a total of 123,370 requests received. To date, in FY 2020, the ICE FOIA Office has received 41,331 requests.

6. In short, between FY 2017 and FY 2019, the ICE FOIA Office experienced approximately a 258% increase in FOIA requests. This dramatic increase in ICE FOIA's workload is attributed to the aforementioned increased number of referrals ICE receives from USCIS and the increased public interest in the Department's operations as they pertain to recent Presidential and/or Executive Orders and subsequent guidance from the Secretary of Homeland Security.

7. In addition to the increasing volume of FOIA requests, ICE has also experienced an increase in the complexity of FOIA requests, both in terms of volume and substance. For example, it is now not uncommon to see FOIA requests with 50 to 60 sub-parts comprising several pages, searches of numerous program offices, and a universe of records that has thousands of pages to review and process. These FOIA requests take considerably longer to process due to extensive searches that are usually required, and the intricacies of the documents and/or data produced. In FY 2019, one FOIA requester alone – a data clearing house – filed more than 370 FOIA requests seeking extensive data extracts. In FY 2020, the same requester filed more than 480 similar FOIA requests.

8. All these factors have nearly doubled the ICE FOIA Office's overall workload in comparison to FY 2017. In response to the increasingly heavy workload, the ICE FOIA Office has adopted the court-sanctioned practice of generally handling backlogged requests on a "first-

in, first-out basis," which ensures fairness to all FOIA requestors by not prioritizing one request over another. For FY2020, the ICE FOIA Office closed 79,081 cases and 17,060 referrals from USCIS. The ICE FOIA Office has many unfilled positions. Currently, ICE has vacancies for the following positions: FOIA Officer, Deputy FOIA Officer, four (4) Paralegal Supervisors and seven (7) processors.

9. The ICE FOIA Office tracks all the requests it receives, both directly and by referral, through FOIAXpress, which is ICE FOIA's case management system. If needed, before importing documents to FOIAXpress, the ICE FOIA Office will use a separate program called Relativity, an eDiscovery platform, to initially process documents for productions. This software allows ICE FOIA to remove duplicate documents and group email threads, reducing overall page counts and thus facilitating faster and more efficient document production. Relativity can also facilitate narrowed searches within document sets, which is a function that FOIAXpress lacks. However, FOIAXpress and Relativity are not interoperable systems, and documents cannot be transferred or shared between the systems in an efficient fashion. Once records have been processed through Relativity, those records then need to be manually entered in FOIAXpress.

## III. ICE FOIA OFFICE'S STAFF LEVELS AND WORKLOAD

10. A consequence of the increasing complexity and volume of ICE FOIA's workload (see paragraphs 4-8) is that more of those FOIA requests become subject to litigation in U.S. District Court.

11. The ICE FOIA Litigation Processing Unit is currently comprised of two full-time, experienced paralegals who are processing 148 active FOIA litigations as of the date of this declaration. There are currently 60 court ordered FOIA litigation cases that have rolling

productions, which yield a monthly litigation review and processing page count of between 25,000-28,000 pages, with total of 13,700 pages being released every month. ICE's normal processing rate is 500 pages per month, per case. Additionally, there are cases that are added each month which increase the case list and resulting productions. With the monthly additions, the two full-time paralegals will be required to process nearly 40,000 pages per month. These page-count numbers do not take into account the more than 60 additional FOIA lawsuits that require a single versus rolling production.

12. The ICE FOIA Litigation Processing Unit also drafts, assigns, and tracks any and all searches for responsive documents in response to FOIA litigations. These search taskings can span dozens of ICE programs and field offices and require the Unit to keep track of hundreds of thousands of responsive documents, as well as each of the office's search documentation.

13. The two full-time paralegals who comprise the ICE FOIA Litigation Processing Unit also have other duties, in addition to processing documents pursuant to litigation.[2] For example, these two individuals also prepare various reports, process Congressional inquiries, redact Prison Rape Elimination Act ("PREA") and Office of Detention Oversight ("ODO") reports, send out FOIA (b)(4) submitter notices on relevant cases, and handle consults and referrals from other agencies as they come in. The Unit also supports attorneys in the ICE Office of the Principal Legal Advisor on federal FOIA litigations, assisting in the creation of *Vaughn* indexes, declarations, and other necessary filings.

[2] There were four full-time paralegals in the Litigation Processing Unit. However, one is currently on maternity leave and one is no longer employed by ICE.

14. The members of the ICE FOIA Litigation Processing Unit also manage a host of other administrative duties, including (but not limited to) monitoring the ICE FOIA inbox (which receives from 12,000-18,000 emails annually relating to inquiries on status of FOIA requests, correspondences from other agencies, referrals or consults), processing all classified consults and referrals, scheduling productions, preparing clearance emails, and preparing other correspondence to requesters.

15. In total, each member of the ICE FOIA Litigation Processing Unit can process on average 100-300 pages per day, depending on the complexity of the documents, and are still required to keep up with their overall job requirements.

16. Outside of the Litigation Processing Unit, the ICE FOIA Office currently has a staff of nineteen (19) FOIA specialists dedicated to processing FOIA requests solely at the administrative level. These FOIA processors work on Alien File requests and other FOIA requests that either are referred or have been submitted directly to the FOIA Office. The litigation team solely works on cases that are in litigation and with court ordered deadlines. They only process litigation related records and wok on products of those records. The processors are responsible for responding to the original FOIA requests and, if necessary, reprocessing remands on appeal. In FY 2019, these FOIA processors completed and closed out 65,213 FOIA requests. Unfortunately, at this time, ICE FOIA does not have authority to hire any additional FOIA processor employees; indeed, as mentioned above, ICE FOIA employees have been lost due to budget cuts.

17. In order to meet its obligations for all cases in litigation, and to ensure that all of the FOIA matters progress so that each requester can receive a response, the ICE FOIA Office

typically cannot process more than 500 pages per month for each case. Any increase in one matter would hinder ICE FOIA's ability to process records for productions in other matters.

18. Moreover, the ICE FOIA Office typically cannot *produce* a set number of pages per month. Depending on the volume of records located in the search tasking phase of the administrative stage and/or FOIA litigation, if the Court would order ICE FOIA to *produce* a certain number of pages per month, it is entirely plausible that the processors would have to review hundreds, or even thousands, of additional pages on top of the 500 pages that are attainable, in order to get to the requisite production number. ICE FOIA is incapable of achieving this outcome based on the limited resources available and the competing priorities, litigation and non-litigation deadlines, and the sheer volume of overall work.

## IV. LIMITATIONS ON ICE RESOURCES AND ICE'S ALLOCATION OF RESOURCES TO MEET THE COURT'S DEADLINE

19. As detailed in paragraph 7 above, the complexity of FOIA requests submitted to ICE FOIA has greatly increased, resulting in requests that include multiple parts and subparts, which in turn leads to a large volume of potentially responsive records that require review and processing.

20. Not only do these complex FOIA requests require a more extensive search to be performed by the appropriate program offices, but they also require a comprehensive review process once search results are returned.

21. Pursuant to the November 3, 2020 Court Order, ICE completed its searches of the three-field offices by November 23, 2020.

22. In response to Court's Final Judgment of October 19, 2020 and November 3, 2020 Order, the ICE FOIA Office has been working diligently to allocate the necessary recourses in response to the Court's deadlines.

23. ICE worked with Plaintiff in identifying records custodians and search terms. The parties finalized search parameters on November 6, 2020. In total, 13 search terms were used to conduct the new search for responsive records. Forty-nine (49) custodians in three field offices were identified for the search.

24. Due to the Court's timeframe for ICE to conduct its searches, ICE sought assistance of the Office of Chief Information Officer (OCIO,) to collect all email communications for 49 custodians identified by Plaintiff. ICE began the search on November 9, 2020 and was able to complete it search by November 12, 2020. The total estimated number of documents collected was 2.3 million. This data was for period of one-year as requested by Plaintiff.

25. These documents were then transferred to an attorney, who is in charge of processing data through ICE's Relativity Platform. Relativity is an eDiscovery tool which was used to process and narrow-down the results by applying search terms identified by Plaintiff. It took this attorney three full-working days, including a holiday, to organize and clean the data by extracting "junk files" and "system log files" that were included as part of extraction. This attorney further applied mutually agreed upon search terms to the collected data, which resulted in a reduction of number of documents. On November 10, upon receiving the first batch of data from OCIO, the attorney began processing these records through Relativity. He did not wait for all the data to be collected before organizing and applying the search terms. As OCIO finished each batch of data, it was then forwarded to this attorney and he continued to process the

documents through Relativity. Due to limited licensing associated with Relativity, only one attorney is assigned to processing records through Relativity for litigation purposes.

26. Upon extracting the filtered data and after the search terms were applied, ICE identified approximately 86,000 potentially responsive documents that contained Plaintiff's search parameters.[3] However, upon spot-checking the filtered data, it was apparent that some of the documents were not responsive. Upon further review of the filtered data, one of the processors determined that some of the data might contain non-responsive documents. To eliminate further strain on resources and to efficiently work within its deadlines, the ICE FOIA Office ingested the filtered data back into Relativity to exclude those documents deemed non-responsive. ICE used the following search terms to exclude non-responsive records: "PWP," "Performance Work Appraisals," "Performance Reviews." This process was time consuming and it took one full-time processor, who is in charge of uploading documents, one week (November 16 – November 20, 2020) to import the filtered data back-into Relativity and exclude the non-responsive records. These re-filtered records started being uploaded into FOIAXpress on November 17, 2020.

27. As of date of this declaration, ICE has transferred approximately 55,000 pages into FOIAXpress, ICE's FOIA processing platform. FOIAXpress is used to review and process records for FOIA requests and litigations. Although ICE started uploading the records into FOIAXpress on November 17, 2020, due to the volume of the records, and number of users logged into the system and working during the upload and uploading these pages alone, has taken days. Given that since November 16, ICE has uploaded only 55,000 pages, the average daily

[3] Document amount is distinct from total page count. A single document may contain multiple pages.

Case 3:19-cv-02786-EMC Document 71 Filed 12/08/20 Page 10 of 45

pages that has been uploaded into FOIAXpress has been an estimated 6,875 pages per day. ICE further anticipates that it would take 94-days to upload 650,000 pages into FOIAXpress. Since November 17, 2020, ICE has uploaded 55,000 pages into FOIAXpress, for only four custodians and continues to upload more records for these four custodians. To provide an estimated total number of pages for all custodians, ICE divided the total number of pages so far uploaded, by four (the number of custodians uploaded so far) and the average is an estimated 12,000-14,000 pages per custodian. ICE then multiplied 12,000-14,000 pages by the remaining 45 custodians and the total estimated number of pages of approximately 540,000 to 650,000. The process of uploading these records into FOIAXpress has caused constraint on ICE FOIA resources, in addition to the constraints of the FOIAXpress system (due to high volume traffic), which cannot process Excel spreadsheets and require a manual transfer to a shared drive.

28. In addition, to comply with the Court's Order, the ICE FOIA Office allocated ten full-time processors, which is 30% of its total workforce, to this case. It is anticipated that each processor, will be able to review and process approximately 300-500 pages per day. However, this does not complete ICE's review process. Upon completion of first-line review, the records must undergo second-line review.

29. For the second-line review, ICE has allocated 10-15 attorneys to review approximately 250 pages per day, per attorney.[4] These attorneys are carrying a full load of cases in litigations and are responsible for handling other portfolio related legal issues. On average, it

[4] This number is just an estimate. Due to upcoming holidays, ICE us unable to provide more precise number of records that would be reviewed by the attorneys.

takes one minute for each attorney to review each page, thus it means that these attorneys are dedicating half of their working day to review these records.

30. As previously stated, in conducting the new search, ICE applied 13 search terms to the records of 49 custodians in three field offices re identified for the search. ICE estimates approximately 650,000 pages of potentially responsive records have been identified.

31. ICE has determined that these potentially responsive records might contain DHS and U.S. Customs and Border Protection (CBP) equities. ICE has reached out to each agency's point of contact and notified them of the upcoming productions for DHS and CBP's review. DHS has instant access to ICE's FOIAXpress and can review records with DHS equities more quickly. This will cut down on the time associated with extracting and sending documents for consultation and re-loading proposed redactions to the system but will require a multi-agency effort to process and produce non-ICE records.

32. As of the date of this declaration, ICE has created 50-separate folders in FOIAXpress. Each folder contains approximately 1,000 to 1,200 pages, totaling 55,000 pages. Out of those 50 folders, 25 folders have been assigned to attorneys who will be conducting second-line review, to also conduct responsiveness review. Of those 25 folders, 21 folders have been assigned to both first line and second-line review.

33. As of the date of this declaration, ICE has reviewed eight folders. Of those folders, one folder was produced on November 24, 2020. For this production, ICE reviewed total of 1,032 pages. Only 302-pages were deemed responsive. Out of those pages, 249 pages were released in part, 40 pages were referred to other agencies, three (3) pages were withheld in full and remaining were released in full. ICE has asserted FOIA Exemptions (b)(5), (b)(6), (b)(7), and (b)(7)(E).

34. The responsive records from the remaining seven folders, is anticipated to be produced by Friday, November 27, 2020. In reviewing these said folders, ICE reviewed a total of 8,802 pages. ICE determined 2,732 pages (approximately 32% of the records) were non-responsive. ICE estimates CBP has an equity interest in 869 pages, which will require referral to CBP for comment. In this production, ICE is producing 347 pages in full. ICE is withholding 305 pages in full, and producing 2080 pages with redactions as a result of FOIA exemptions claimed.

35. On November 26, 2020, Plaintiff identified 22 custodians for the El Paso Field Office. ICE estimates 250,000 - 300,000 pages of potentially responsive records will be identified from these 22 custodians. Applying the resources described above, ICE can complete review and production of all its responsive records from the El Paso Field Office by March 31, 2021.

36. I have been informed that DHS Headquarters committed to completing its review and production of any El Paso Field Office records they have a primary equity interest in by March 31, 2021. ICE will work with CBP, or other agency identified to have equity interest in documents, in effort to produce all responsive records from the El Paso Field Office by March 31, 2021.

37. It is my understand that if the Court extends ICE's deadline to produce documents, after production for El Paso is complete, the parties will confer and present a new production for all remaining documents.

38. ICE will continue to allocate the resources described herein to Plaintiff's FOIA request.

39. ICE will continue to engage with Plaintiff in an effort to better focus the search and production.

## V. JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this ____27__ day of November 2020.

______________________________
Fernando Pineiro, FOIA Officer
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ROBERT MOORE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-00279-DCG |
| | § | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE RESPONSE IN EXCESS OF PAGE LIMIT**

Having considered Plaintiffs' Unopposed Motion for Leave to File Response in Excess of Page Limit, this Court is of the opinion that said motion should be GRANTED.

IT IS HEREBY ORDERED that the Plaintiff's Response to Defendant CBP's Motion for *Open America* Stay be accepted for filing with the Court.

IT IS FURTHER ORDERED that the CLERK shall FILE Plaintiff's Response to Defendant CBP's Motion for *Open America* Stay on the date of this order.

SIGNED AND ENTERED this ____ day of _______________, 2020.

SIGNED this ____ day of _________________, 20____.

_________________________________
DAVID C. GUADERRAMA
United States District Judge

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ROBERT MOORE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-00279-DCG |
| | § | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING DEFENDANT CBP'S MOTION FOR *OPEN AMERICA* STAY AND EXTENSION OF FINITE PRODUCTION SCHEDULE**

Having considered Defendant's Motion for *Open America* Stay and Extension of Finite Production Schedule, Plaintiff's Response, and the record before it, the Court is of the opinion that said motion should be DENIED.

IT IS HEREBY ORDERED that DEFENDANT U.S. CUSTOMS AND BORDER PROTECTION (CBP):

(1) SHALL confer by December 31, 2020 with Plaintiff and Plaintiff's expert to properly process and narrow the scope of CBP's search responsive documents to respond to both Requests Nos. CBP-2018-064544 and CBP-2019-010211 (the requests);

(2) SHALL completely process and produce all responsive records pertaining to CBP-2018-064544 by March 31, 2021;

(3) SHALL completely process and produce all responsive records pertaining to CBP-2019-010211 by March 31, 2021;

(4) SHALL continue to provide periodic production for the Requests to Plaintiff on a monthly basis; and

(5) SHALL continue to provide this Court with monthly status reports to be filed on the fifth of each month until final production is complete.

SIGNED AND ENTERED this ____ day of _______________, 2020.

SIGNED this ____ day of _________________, 20____.

_________________________________________
DAVID C. GUADERRAMA
United States District Judge