**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ROBERT MOORE** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-19-CV-00279-DCG** |
| | § | |
| **U.S. IMMIGRATION AND CUSTOMS** | § | |
| **ENFORCEMENT; U.S. CUSTOMS AND** | § | |
| **BORDER PROTECTION; AND** | § | |
| **U.S. DEPARTMENT OF HEALTH** | § | |
| **AND HUMAN SERVICES,** | § | |
| **Defendants.** | § | |

**DEFENDANT CBP'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT CBP'S OPPOSED MOTION FOR *OPEN AMERICA* STAY AND EXTENSION OF FINITE PRODUCTION SCHEDULE**

Customs and Border Protection (CBP) seeks a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C) and *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), and to extend its deadline under the finite production schedule, and in support of this motion, states as follows:

## ARGUMENT

CBP is diligently processing Plaintiff's FOIA requests while confronted with extraordinary circumstances. Despite its heavy workload, backlog, and limited resources, CBP has dedicated extraordinary resources to processing Plaintiff's requests. CBP respectfully asserts an *Open America* Stay is required to allow it to properly review and produce records responsive to Plaintiff's FOIA broad requests. *See Open Am.*, 547 F.2d at 605.

In determining whether an *Open America* stay warrants granting, courts have generally evaluated four conditions that must be satisfied: "(1) when an agency is burdened with an unanticipated number of FOIA requests; and (2) when agency resources are inadequate to process

the requests within the time limits set forth in the statute; and (3) when the agency shows that it is exercising due diligence in processing the requests; and (4) the agency shows reasonable progress in reducing its backlog of requests." *Elec. Frontier Found. v. Dep't of Justice*, 563 F. Supp.2d 188, 193 (D.C. Cir. 2008); *Summers v. Dep 't of Justice*, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors).

**1. Agency Burden and Backlog**

This Court has previously found exceptional circumstances exist due to the exigent circumstances presented by the COVID-19 pandemic. ECF No. 51, pp. 5-6. Now, in opposing CBP's request, Plaintiff asserts CBP conflates its FOIA workload over the last several fiscal years with conclusory statements regarding the impact of the COVID-19 crisis. ECF No. 64, p. 5. Plaintiff asserts CBP has "failed to establish how it has made reasonable progress in reducing its backlog" and that CBP failed to exercise due diligence in processing Plaintiff's FOIA request. *Id*. To support his assertions, Plaintiff relies on the declaration of Mr. Kyle R. Campbell. *Id*., pp. 3, 19-25.[1] Plaintiff's assertions, much like Mr. Campbell's reasoning and opinions, are flawed.

Mr. Campbell claims to be an "expert in both technology and practices for large-scale collection and processing of eDiscovery for large organizations." ECF No. 64, p. 19, ¶ 3. In developing his opinions, Mr. Campbell asserts he conducted an independent review of budget analysis for DHS, CBP, and other sister agencies. ECF No. 64, p. 20, ¶ 9. He further claims to

[1] Shortly after filing Plaintiff's Response, Plaintiff's counsel advised defense counsel of two inadvertent numerical errors in Plaintiff's Response. First, Plaintiff's Response inadvertently states "eleven" months when referencing the period of time between CBP's search in February and Plaintiff's response. ECF No. 64, p. 3. Plaintiff's counsel advised the correct calculation is "ten" months. Plaintiff references the ten-month period elsewhere in his Response. *Id*., pp. 10-11, 14-15. Second, Plaintiff's response refers to a "five-week period of communication" that was subject to Plaintiff's November 2018 request. ECF No. 64, p. 12. In fact, the time period is 42 days (October 1, 2018 to November 11, 2018) – or six weeks. Rather than requiring Plaintiff to file a corrected motion, the parties agreed to address these corrections in this Reply.

have reviewed the Office of Inspector General's (OIG) "DHS' Process for Responding to FOIA and Congressional Requests" (OIG Report) published in July 2020. *Id*. *See also* Ex. 4, OIG Report. However, Mr. Campbell's analysis is flawed and amounts to nothing more than a layperson's speculation.

Mr. Campbell does not express any familiarity with handling of FOIA matters. *See* ECF No. 64, pp. 19-28 generally. He fails to identify any distinction between eDiscovery conducted in civil litigation versus FOIA requirement as set forth in 5 U.S.C. § 552. *Id*. Mr. Campbell fails to express any knowledge in federal government's budgetary or procurement processes, to include, but not limited to, DHS Acquisition Regulations (HSAR) and the Federal Acquisition Regulations (FAR). *Id*., pp. 19-20, ¶¶ 2-5. *See also id*., pp. 27-28. He also claims to have reviewed the OIG Report but fails to note that the OIG Report only reviewed the handling of FOIA requests sent to the DHS Secretary and Deputy Secretary. Ex. 4, p. 2. Those requests are handled by the DHS Privacy Office. *See id*, pp. 3-4. The OIG Report did not review requests, like Plaintiff's, that were sent directly to DHS components. *Id.*, p. 2, n.4.

Critically, Mr. Campbell fails to reference the OIG commending "DHS for proactively creating its FOIA backlog reduction plan in March 2020." *Id.*, p. 16. In March 2020, DHS issued its Departmental FOIA Backlog Reduction Plan: 2020-2023 (Backlog Reduction Plan). *See* Ex. 3, Backlog Reduction Plan. In its report, the OIG notes that "DHS management explained that its FOIA backlog continues to be systematic problem for DHS but initiated its 'DHS 2020 - 2023 FOIA Backlog Reduction Plan' (Plan) in March 2020 to reduce the backlog." *Id*. Further, unlike the OIG Report which focused on the handling of FOIA requests by the DHS Privacy Office, the Backlog Reduction Plan related to DHS <u>and</u> its components. *See* Ex. 4, generally. The Backlog

Reduction Plan noted that "[g]oing forward, the Department and Components will use this plan to coordinate its backlog reduction efforts." Ex. 3, p. 15. The Plan noted,

> there is no easy remedy for reducing the DHS FOIA backlog. The solutions Components regularly rely on – hiring contractors, authorizing overtime, and initiating a surge as the end of the fiscal year draws near – only serve to improve statistics temporarily. Additionally, these efforts can have negative effects on the backlogs at other Components or agencies if they drive up the number of referrals.

*Id.*

The Backlog Reduction Plan included five goals for lowering the size of DHS's backlog. *Id.*, p. 3. The Backlog Reduction Plan specifically notes that in fiscal year (FY) 2018, DHS components, U.S. Citizenship and Immigration Services (USCIS), CBP, U.S. Immigration and Customs Enforcement (ICE), and the Office of Biometric Identity Management (OBIM) held 92 percent of the Department's backlog. *Id.*, p. 7. The Backlog Reduction Plan notes that DHS components have decentralized operations with independent responsibility for establishing, operating, and appropriately resourcing their FOIA operations, subject to the oversight by the DHS Privacy Office. *Id.*, p. 11. The Backlog Reduction Plan, much like Mr. Howards attestation, notes that FOIA requests have also become more complex and voluminous. *See id.*, p. 6. *See also* ECF No. 59, p. 19, ¶ 5. Despite these obstacles, the Backlog Reduction Plan calls for CBP to have an annual 10 percent reduction in the backlog. Ex. 3, p. 13. Mr. Campbell fails to address any of these factors prior to formulating his opinion on whether CBP has exercised due diligence in processing Plaintiff's requests.

CBP efforts to comply with the Backlog Reduction Plan have been hindered by the COVID-19 pandemic. On April 3, 2020, shortly after DHS issued its Backlog Reduction Plan, CBP reported to this Court the stains it was experiencing as a result of the circumstances resulting from COVID-19. *See* ECF No. 35, p. 3, ¶ 7. CBP further reported that despite the challenges of

the pandemic, CBP has resolved many of its initial issues and continues working to reduce its backlog. ECF No. 59, p. 21, ¶ 17. As of November 20, 2020, CBP had over 1,000 backlog requests consisting of principally large volume complex requests. *Id*., p. 20, ¶ 6.

Mr. Campbell appears to formulate his opinion in a vacuum instead of basing it on any expertise in FOIA, federal government budget or procurement policies, or any understanding of CBP's allocation of resources to Plaintiff's requests compared to its overall workload and backlog. Contrary to Mr. Campbell's opinions, CBP's proposed production schedule is based on Mr. Howard's experience and understanding of realistic production rates. *See* ECF No. 59, p. 24, ¶¶ 30-32, 34, 36. This Court should implement an *Open America* Stay and adopt the CBP's proposed production schedule for Plaintiff's requests.

**2. Agency Resources**

Plaintiff asserts CBP has "failed to utilize several simple methods" to process Plaintiff's FOIA request. ECF No. 64, p. 3. Plaintiff's purported "expert", Mr. Campbell, suggests non-viable solutions that reflect a lack of understanding of FOIA requirements or federal governmental budgetary and procurement procedures.

Mr. Campbell notes CBP has 8.5 Terabytes of processing licenses on Clearwell. ECF No. 64, p. 21, ¶ 13. CBP available processing licenses were insufficient to upload the total data from one of Plaintiff's search results. *Id*. Mr. Campbell opines that CBP could simply "pay for additional processing space on a pro rata basis while [CBP] processes the data." *Id*. at 22, ¶ 17. However, the Anti-Deficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341(a)(1)(A). Federal employees cannot involve the government in any obligation to pay money before funds have been

appropriated for that purpose (*id*. at § 1341(a)(1)(B)), or from making obligations or expenditures in excess of an apportionment or reapportionment, or in excess of the amount permitted by agency regulations. *See* 31 U.S.C. § 1517(a). Thus, in order to purchase pro rata Clearwell licensing as Mr. Campbell suggests, CBP would have to get prior approval through the multi-step procurement and budgetary processes. *See* Ex. 2, ¶ 10, Declaration of Patrick Howard, executed December 23, 2020.[2]

Mr. Campbell next opines that Discovery Accelerator could be used to reduce the amount of potentially responsive data identified from the FOIA search. *See* ECF No. 64, p. 22, ¶¶ 18-19, 33-34. However, as explained by Mr. Howard, Discovery Accelerator is limited in its search capabilities and is significantly slower than Clearwell. Ex. 2, ¶ 9. Discovery Accelerator cannot perform some of the advanced searches that Clearwell can perform to help narrow down search results. *Id*. The CBP FOIA Division does not currently have the software capabilities to electronically filter out these non-responsive records from the potentially responsive data identified in the search for request CBP-OFO-2019-010211. *Id*., ¶ 8. The documents thus require manual review. *Id*.

Mr. Howard adds that some suggested limiters by plaintiff would not reduce the results significantly. *Id*., ¶ 9. Mr. Howard notes that the CBP FOIA Division is finding a large number of non-responsive records reference “Mobile Field Force.” *Id*., ¶ 8. The term “Mobile Field Force” is a broad term as used by CBP. *Id*. The term as been found to relate to such non-responsive issues as other field operations, drills, threat vulnerability assessments, or other law enforcement matters at various ports of entry. *Id*. Mr. Howard explains that numerous large documents contain the terms

[2] Exhibit 1, Declaration by Patrick Howard, is attached to Defendant CBP’s Opposed Motion for *Open America* Stay and Extension of Finite Production Schedule. ECF No. 59, pp. 18-25.

"Mobile Field Force" as well as a suggested limiter like "El Paso." *Id*., ¶ 9. These documents would not be excluded through a secondary filtration through Discovery Accelerator. *Id*. To date, CBP has not been able to identify any additional search terms that could be used for a secondary filtration of data that would significantly or accurately extract non-responsive records from the data identified in CBP's initial search. *Id*.

In responding to Plaintiff's FOIA requests, CBP advised this Court in November 2020, that it has two full-time employees exclusively dedicated to Plaintiff's requests. *See* ECF No. 59, p. 25, ¶ 36. Only one other request pending in the CBP FOIA Division has a staff person exclusively assigned to its processing. *Id*., ¶ 37. CBP articulated its heavy workload and limited resources. ECF No. 59, p. 19, ¶ 5 and p. 20, ¶¶ 6-8. Similarly burdened, CBP's eDiscovery team consists of six staff members who not only assist with FOIA responses, but also assist in retrieving data for criminal and employment matters. Ex. 2, ¶ 11. The eDiscovery team currently has 84 active projects that they are working on, and over 100 projects in the queue. *Id*. Many of these involve investigations both within CBP, and with other law enforcement agencies. *Id*. Prioritizing Mr. Moore's second search ahead of older requests, and devoting additional resources to his litigation, would significantly and adversely affect the processing of older FOIA requests and the eDiscovery team's ability to timely assist in criminal and employment matters. *Id*. CBP has dedicated extraordinary resources to Plaintiff's request. In asserting his opinion, Mr. Campbell fails to address CBP's excessive workload relating to all its FOIA requests or the extraordinary dedication of resources CBP has committed to Plaintiff's requests. This Court should implement an *Open America* Stay and adopt the CBP's proposed production schedule for Plaintiff's requests.

**3. Due Diligence**

CBP's proposed production schedule commits to completing final supervisory review of at least 5,000 pages of records per month. ECF No. 59, pp. 13-14. This is a tenfold increase in the typical number of pages reviewed for a request. *Id*. at p. 14. CBP's proposed production schedule is based on Mr. Howard's experience and good faith estimation of CBP's realistic production capabilities given the extraordinary resources allocated to Plaintiff's requests. "[I]n analyzing the affidavits and declarations submitted by the government, the agency is entitled to a 'presumption of legitimacy' unless there is evidence of bad faith in handling the FOIA request." *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010) (citing *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991)). In November 2020, CBP completed review of nearly 14,000 pages. *See* Ex. 2, ¶ 7. While monthly final review of 14,000 pages is likely unsustainable every month, it demonstrates CBP's commitment to completing processing of Plaintiff's FOIA requests.

Plaintiff complains of the limited number of responsive documents produced from the large volume of data identified as potentially responsive from its search. Mr. Howard attests that Mobile Field Force represents a broad term as used by CBP. Ex. 2, ¶ 8. The term Mobile Field Force is not limited to a single demonstration in El Paso that did not occur. Non-responsive records identified by the term "Mobile Field Force" include issues relating to other field operations, drills, threat vulnerability assessments, and other law enforcement matters. *Id*. These documents require manual review. *Id*.

In November 2020, CBP reviewed 13,929 pages of records. Ex. 2, ¶ 7. CBP exceeded its minimum commitment of 5,000 pages reviewed each month. *See* ECF No. 59, p. 25, ¶ 36. CBP has now reviewed nearly 34,000 (19,805 + 13,929 = 33,734) of the its originally estimated total of

63,600 pages of records.[3] *Id.*, ¶ 6-7. By comparison, Mr. Campbell significantly understates the volume of potentially responsive records. He asserts the "[g]enerally accepted eDiscovery metrics give a rule of thumb that there are usually an estimated 3.5 pages per document." ECF No. 64, p. 21, ¶ 13. For Plaintiff's request CBP-OFO-2019-010211, Mr. Campbell notes CBP identified 8,358 documents as potentially responsive. *Id.*, p. 24, ¶ 26. Applying Mr. Campbell's "generally accepted eDiscovery metrics", CBP should have to review less than 30,000 pages of records for this request.[4] However, as attested to by Mr. Howard, CBP has already reviewed nearly 34,000 pages or records. Ex. 2, ¶¶ 6-7.

Mr. Campbell also uses the "generally accepted eDiscovery metrics" to estimate Plaintiff's request number CBP-2018-064544 will only consist of 26,000 – 43,000 pages. ECF No. 64, p. 23, ¶ 23. Estimating 35,000 pages for this request, Mr. Campbell opines that final review of all pages could be completed in 175 days. *Id.* By comparison, Mr. Howard's educated estimation estimates this request will consist of 90,000 – 150,000 pages of potentially responsive records. ECF No. 59, p. 24, ¶ 34. By Mr. Campbell's own calculations, if request CBP-2018-064544 only has 90,000 pages of potentially responsive records as conservatively estimated by Mr. Howard, it will take CBP approximately 450 days,[5] or 15 months, to complete its review and production. CBP has presented the Court a production schedule based on the realistic anticipated results from a person experienced in handling FOIA requests. This Court should grant an *Open America* Stay and adopt the production schedule proposed by CBP.

[3] CBP advises that it now appears the total page count for FOIA request CBP-OFO-2019-010211 will likely exceed the original estimate. Ex. 2, ¶ 5.

[4] 8,358 documents times 3.5 pages per document equals 29,253 pages.

[5] 90,000 divided by 35,000 equals 2.57. 175 days times 2.57 equals 450 days.

## CONCLUSION

For the foregoing reasons, CBP respectfully requests that the Court grant this motion and stay proceedings in this case with respect to Plaintiff's request until June 30, 2021.

Respectfully submitted,

**GREGG N. SOFER**
UNITED STATES ATTORNEY

/s/ Manuel Romero
**MANUEL ROMERO**
Assistant United States Attorney
Texas State Bar No. 24041817
700 E. San Antonio, Ste. 200
El Paso, Texas 79901
Office: (915) 534-6555
Facsimile: (915) 534-3490
Email: manuel.romero@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants: Lynn Coyle and Christopher Benoit, *Attorneys for Plaintiff*.

/s/ Manuel Romero
**MANUEL ROMERO**
Assistant United States Attorney

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| **ROBERT MOORE,**<br><br>*Plaintiff,*<br><br>v.<br><br>**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br><br>*Defendants.* | **Case No. EP-19-CV-00279-DCG** |

**DECLARATION BY PATRICK HOWARD**

My name is Patrick Howard, and I am a Branch Chief within the Freedom of Information Act Division (FOIA Division) at U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS).

1. I have been a Branch Chief in the FOIA Division since February 8, 2015. In this capacity, I oversee a staff of Government Information Specialists (GIS), the processing of requests for records submitted to CBP pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Privacy Act (PA), 5 U.S.C. § 552a, and other activities conducted pursuant to applicable records access provisions.

2. I am familiar with CBP's procedures for responding to FOIA requests. I provide technical and administrative supervision and direction to a group of FOIA specialists in processing FOIA requests and assist with FOIA/PA litigation matters, and I am personally familiar with the processing of FOIA/PA responses, including, at times, by directly reviewing for adequacy and compliance with federal laws and regulations.

3. The statements in this Declaration are made on the bases of my personal knowledge of the internal operations of this office and agency and information acquired by me in the course of the performance of my official duties.

4. I am familiar with the procedures followed by CBP in responding to requests for information pursuant to the provisions of FOIA, and with the requests made by the Plaintiff in the above-captioned matter.

5. CBP's search for responsive records relating to FOIA request CBP-OFO-2019-010211 identified 511 files of potentially responsive records. The 511 files consisted of 6,064 emails containing 8,358 documents. CBP originally estimated the 8,358 documents consist of approximately 63,600 pages of records. It now

appears likely that the total page count for this request will exceed the original estimation.

6. Between February and October, 2020, the CBP FOIA Division reviewed approximately 85 files consisting of 19,805 pages of potentially responsive records. One hundred twelve (112) pages of the reviewed records were deemed responsive and partially releasable.

7. During November, 2020, the CBP FOIA Division reviewed approximately 21 files consisting of 13,929 pages of records. The FOIA Division found 12,333 pages of these records to be non-responsive to Plaintiff's request. Additionally, 1,534 pages were deemed duplicative, and one page was deemed responsive but withheld in full pursuant to Title. 5 U.S.C. § 552(b)(5). On December 21, 2020, the FOIA Division released 61 pages of partially redacted records to Plaintiff.

8. Plaintiff's FOIA request seek records relating to a Mobile Field Force Demonstration originally scheduled for November 6, 2018. The CBP FOIA Division is finding a large number of non-responsive records reference "Mobile Field Force." The term "Mobile Field Force" is a broad term as used by CBP. The term as been found to relate to such non-responsive issues as other field operations, drills, threat vulnerability assessments, or other law enforcement matters at various ports of entry. The CBP FOIA Division does not have the software capabilities to electronically filter out these non-responsive records from the potentially responsive data identified in the search for request CBP-OFO-2019-010211. The documents thus require manual review.

9. Discovery Accelerator is limited in its search capabilities and is significantly slower than Clearwell. Discovery Accelerator can not perform some of the advanced searches that Clearwell can perform to help narrow down search results. Further, some suggested limiters by plaintiff would not reduce the results significantly. As stated previously, Mobile Field Force is a broad program, of which these specific training exercises were a very small part. There are numerous large documents which contain the terms "Mobile Field Force" as well as a suggested limiter like "El Paso." All of these would still be included. To date, CBP has not been able to identify any additional search terms that could be used for a secondary filtration of data that would significantly or accurately extract non-responsive records from the data identified in CBP's initial search.

10. As it pertains to Clearwell, the eDiscovery group has a finite amount of processing licenses and the outstanding pull is too large to process as the data size exceeds the amount of remaining licenses. CBP can not simply purchase pro rata licenses to handle large pulls. Procurement in the government is not the same as the private sector, there is a process that must be followed, multiple quotes must be solicited, and the licenses are expensive. CBP operates on an approved government budget, they can not simply purchase more licenses without first locating money to do so, then going through multiple steps and levels of approval before any purchase can be made. These monetary requests must compete with other requests from all CBP offices and must be prioritized based on the overall CBP mission.

11. In addition to the budget constraints, the eDiscovery team has just six staff. In addition to assisting in FOIA responses, the eDiscovery team maintains other duties such as assisting in retrieving data for criminal and employment investigations. There are currently 84 active projects that this team is working on and over 100 still in the queue. Many of these involve investigations both within CBP, and with other law enforcement agencies. All are of significant importance. Prioritizing Mr. Moore's second search ahead of older requests, and devoting additional resources to his litigation would significantly and adversely effect the processing of older FOIA requests and the eDiscovery teams ability to timely assist in criminal and employment matters.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Patrick Howard

Patrick Howard
Branch Chief, FOIA Division

Executed December 23, 2020

# EXHIBIT 3

# U.S. Department of Homeland Security

# Departmental Freedom of Information Act (FOIA)

# Backlog Reduction Plan: 2020 - 2023

*A Business Modernization Roadmap*




March 2020

*With honor and integrity,*
*we will safeguard the American people,*
*our homeland, and our values.*

# Table of Contents

Executive Summary ... 3
Introduction ... 4
The Challenge: DHS Backlog and Systemic Challenges ... 6
Increase in Requests Received and Productivity ... 7
DHS Efforts to Increase Productivity and Reduce the Backlog ... 8
Implementing the Backlog Reduction Roadmap ... 9
FOIA Backlog Reduction Goals ... 11
Goal 1: Improve Service to the Public by: ... 13
Reducing High-volume Component FOIA Backlogs by 10 percent ... 13
Reducing Low-volume Component FOIA Backlogs by 15 percent ... 14
Responding to FOIA Requests in a Consistent Timely Manner ... 15
Reducing the Age of Open Requests ... 15
Goal 2: Improve Service to the Department by: ... 16
Increasing Stakeholder Satisfaction with Reliability, Security, Privacy, and Responsiveness ... 16
Mitigating Risks ... 17
Enabling Faster, More Accurate and Better Documented Decisions ... 18
Improving Data Reliability and Consistency ... 19
Goal 3: Improve FOIA IT Infrastructure by: ... 20
Eliminating Duplication by Reducing the Number of Systems Used to Process FOIA Requests ... 20
Increasing Efficiency by Ensuring Interoperability between Solutions to Enable Faster, More Accurate Processing ... 22
Promoting the Use of Artificial Intelligence to Enable a Quicker Path to New Capabilities ... 23
Increasing Use of Shared Resources ... 23
Fostering Innovation to Improve Operational Efficiency ... 23
Goal 4: Improve FOIA Workforce Engagement by: ... 24
Demonstrating Investment in Front-line Employees ... 24
Establishing Government Information Specialist (FOIA) Career Paths ... 25
Automating Routine Work Enabling Employees to Focus on the More Complex Tasks ... 27
Changing the Culture of the FOIA Employee/Stakeholder Relationship ... 27
Goal 5: Strengthen the FOIA Policy and Oversight Framework ... 28
Clarifying and Delineating Authorities and Responsibilities ... 28
Solidifying FOIA Officer Relationships ... 29
Establishing a DHS FOIA Compliance and Oversight Program ... 29
Conclusion ... 30

## Executive Summary



The Department of Homeland Security (DHS) has a broad mandate to secure the nation from threats. The DHS mission is to safeguard the American people, our homeland, and our values with honor and integrity. To accomplish this mission, DHS relies on a dedicated workforce of more than 240,000 employees in jobs that range from aviation and border security to emergency response, from cybersecurity analyst to chemical facility inspector.

DHS is proud of the investments made in our Freedom of Information Act (FOIA) program and workforce. The Department's FOIA program provides the public and Department with an immensely valuable service, providing records that promote transparency and directly impact and assist the public while also protecting sensitive, confidential, and private information.

The DHS 2020 - 2023 FOIA Backlog Reduction Plan includes five goals that lay out a sustainable course for containing and reducing the age of the backlog in the short-term, and sustainably lowering the size of the backlog over the next three to five years. To achieve success, the plan addresses the underlying causes of the backlog – including decentralization, technology and interoperability limitations, and staffing and resource constraints.

The Department's FOIA vision is to embrace modern workforce and information management techniques, leverage technology, enhance our systems and rebuild our processes, to create a modern, mature, and sustainable FOIA program. Modernization and maturation will benefit members of the public and our staff, and allow the agency to focus its attention on its mission-critical operations. As a result of these efforts, the DHS FOIA Program will achieve its five goals: 1) Improve Service to the Public; 2) Improve Service to the Department; 3) Improve the FOIA IT Infrastructure; 4) Improve FOIA Workforce Engagement; and 5) Strengthen the FOIA Policy and Regulatory Environment.

Sincerely,

James VML Holzer, I

James V.M.L. Holzer
Deputy Chief Freedom of Information Act Officer
U.S. Department of Homeland Secretary

## Introduction

The work of DHS employees touches the public on a regular basis. An employee with U.S. Customs and Border Protection (CBP) inspects imported consumer products at U.S. ports of entry, from food to kids' toys and other household goods. The Cybersecurity and Infrastructure Security Agency (CISA) ensures you can safely connect to the internet. The Transportation Security Administration (TSA) ensures that you can safely travel to visit loved ones, see new places, and enjoy vacation time away from home.



*CBP officers inspect goods at a U.S. port of entry.*




*FEMA assists the public in the wake of declared natural disasters.*

DHS employees are also available to help the public at dangerous moments in their lives. The United States Coast Guard (USCG) regularly saves people in peril, and conducts investigations into maritime accidents. Federal Emergency Management Agency (FEMA) employees focus on helping people before, during, and after disasters..

DHS employees also have a key role in protecting fundamental parts of our society. U.S. Citizenship and Immigration Services (USCIS) administers the nation's lawful immigration system, and U.S. Immigration and Customs Enforcement (ICE) enforces criminal and civil federal laws governing customs, trade, and immigration. The United States Secret Service (USSS) safeguards the nation's financial infrastructure and payment systems, and protects national leaders, visiting heads of state and government, designated sites, and National Special Security Events.

In conducting its work, DHS employees generate a number of documents that are of great interest to the public. FOIA gives the public the right to access agency records. FOIA includes nine exemptions to protect certain sensitive categories of information like national security or personally identifiable information. Agencies are required to the greatest extent possible to protect only portions of records that are exempt and release all non-exempt information.



*CNew citizens are sworn in at a USCIS ceremony.*

While the primary purpose of the FOIA is to shed light on the government's actions and prevent secret laws, the law is also used by people who are applying for immigration or other benefits, researching family history, seeking business information about competitors' contacts with the agency, and other purposes.

The vast majority of requests sent to DHS are for first-party records, meaning that requesters are seeking copies of information about themselves previously submitted to the government or records that document their interactions with agency officials. DHS receives a substantial number of first-party requests for contents of Alien files (A-Files) held by USCIS, entry-exit records held by CBP, biometric information held by the Office of Biometric Identity Management (OBIM), and personnel records held throughout the Department. Requesters need

these records for personally critical and often time-sensitive reasons – they might be applying for benefits, facing deportation, or challenging their employment termination. DHS also receives third-party requests for these kinds of records related to high-profile people, particularly once the person is deceased.




*The National Records Center in Kansas City, Missouri stores more than 20 million immigration files.*

Requests for A-file material comprise the vast majority of DHS's FOIA workload. A-Files document the life of immigrants in the United States. The average A-file includes around 200 pages; the size of A-Files is increasing and varies significantly based on the number of interactions with U.S. officials and the amount of material submitted to the government by the immigrant. While there have been some recent efforts to digitize some of the forms in A-Files, the records are largely paper-based. These records are held and processed at the National Records Center (NRC), a vast cave located in Lees Summit, Missouri. DHS uses a cave for NRC operations because the environment is beneficial for paper-based records, and is large enough to accommodate the amount of space needed for storage – the facility has an area of nearly six football fields. A-Files might also be located at one of hundreds of field offices around the country. To process a FOIA request for an A-file, USCIS must locate and retrieve the file and digitize its contents using a high speed scanner before the documents can be reviewed.

DHS also holds a number of records that are of regular interest both to first parties and members of the news media. These records might be needed by first parties for certain matters, including but not limited to, applications for benefits and appearances in immigration court. These records may also be of interest to the media due to high-profile incidents or general public interest. This category includes ICE Homeland Security Investigations (HSI) records, the results of USCG accident investigations, and records generated by FEMA related to disaster recovery.

Additionally, the Department produces a number of records that are regularly requested by the news media, academics, civil society organizations, and businesses. Commonly requested records in this category include Congressional correspondence and contracts. There is also a great deal of interest in DHS policies, including policies related to ICE HSI, and in DHS's efforts to implement high-profile administration priorities, such as the construction of a wall on the southern border.

## The Challenge: DHS Backlog and Systemic Challenges




*President George W. Bush signs the Homeland Security Appropriations Act of 2004 at the Department of Homeland Security in Washington, D.C., Wednesday, Oct. 1, 2003.*

DHS inherited a substantial number of pending FOIA requests upon creation in 2003. The first DHS Annual FOIA Report[1] shows that almost 30,000 requests were pending at the end of Fiscal Year (FY) 2003. According to the summary of Annual FOIA Reports compiled by the Department of Justice (DOJ) Office of Information Policy (OIP),[2] about 250,000 requests were pending across the government at the end of FY 2006 – more than 40 percent of these requests were pending at DHS.

Not all pending requests are a part of an agency's FOIA backlog. In FY 2008, OIP issued guidelines requiring agencies to report the number of backlogged requests in their FOIA Annual Reports. Overall, the number of backlogged requests across the government was 133,295; the DHS backlog of 74,879 requests constituted almost 57 percent of the overall FY 2008 backlog.

FOIA backlogs have continued to be a systemic problem at DHS, driven in large part by the continued increases in the number of incoming requests. While DHS has made impressive progress on the number of requests processed each year, these gains have been surpassed by steady increases in the number of incoming requests. The backlog has also been influenced by an increase in the complexity of requests and the volume of electronic records generated by the Department.

Figure 1: FOIA Requests Received, Processed and Backlog FY 2008 – FY 2018




Since FY 2009, DHS has received an average of 249,086 requests and processed an average of 249,439 requests per year. Over the same time period, the average backlog has accounted for about 18 percent of the average number of requests received. The percentage of backlog to

[1] *See:* https://www.dhs.gov/sites/default/files/publications/privacy_rpt_foia_2003.pdf.
[2] *See:* https://www.justice.gov/oip/blog/foia-post-2007-summary-annual-foia-reports-fiscal-year-2006.

requests received ranged from a low of nine percent in FY 2010, to a high of 36 percent in FY 2014, when the DHS backlog hit a high-water mark of 103,778 requests. Between FY 2014 and FY 2015, DHS ramped up the number of requests processed by 47 percent and drove down the backlog by 66 percent. However, between FY 2015 and FY 2018, the backlog increased by about 53 percent.

The majority of the backlog is held by Components that process records related to immigration; in FY 2018, these Components – CBP, ICE, USCIS, and OBIM held 92 percent of the Department's backlog, with USCIS responsible for 77 percent of the backlog. These Components also receive the largest proportion of requests.

DHS is also concerned with reducing the backlog of Components that receive a relatively small number of requests each year compared to the size of the Component's backlog. The ratio of requests received to backlog in FY 2018 was more than 50 percent at the USCG, TSA, and USSS. Monthly oversight reports also indicate that the age of requests in the backlog tends to be higher at Components that do not primarily process immigration-related files.

### Increase in Requests Received and Productivity

The number of requests received by DHS has increased in nine of the last 10 fiscal years. For the majority of this time period, the growth in the number of requests per fiscal year has been in the double digits. Between FY 2014 and FY 2015, the number of requests received decreased by only three percent. In FY 2016, the number of requests received increased by 16 percent, and the number of requests received has grown each year since.

Figure 2: Growth in DHS FOIA Production




While DHS substantially increased the number of requests processed over the last 10 years, the growth in production did not maintain pace with the growth in demand. DHS increased the number of requests processed between FY 2014 and FY 2018 by 92 percent compared to the number processed between FY 2009 and FY 2013. The number of requests received between FY 2014 and FY 2018 increased by 100 percent compared to the number of requests received between FY 2009 and FY 2013.

Figure 3: Increase in Requests Processed and Pages Released




Each year the DHS FOIA program locates, reviews, and releases more records than in previous years. DHS creates a significant volume of electronic records regarding its activities. Electronic search tools have improved the FOIA program's ability to locate records that might be responsive to a FOIA request, and the number of pages released has increased. As depicted in Figure 3, between FY 2017 and FY 2018, the average number of pages released in response to a request grew from 87 to 93, an increase of seven percent. DHS is on track to increase the average number of pages released per request in FY 2019 to more than 100 – another increase of eight percent. Managing the higher volume of records also presents its own challenges with information technology (IT) infrastructure, technology, and workforce constraints.

## DHS Efforts to Increase Productivity and Reduce the Backlog

As previously noted, DHS increased the number of requests processed over the last five years by 92 percent. Key to this increase in productivity was the DHS Privacy Office's initiative to stand up an enterprise-wide FOIA processing solution. This processing solution made the FOIA process fully electronic and included features that increased the ability of the DHS Privacy Office and Component FOIA Officers to appropriately manage and oversee operations.

In addition to compiling the Department's annual oversight reports, the DHS Privacy Office compiles a monthly report monitoring the number of requests and appeals received and processed and the size of the backlog. These monthly reports also capture information about the number of pages released, the age of pending requests, the status of the ten oldest requests from the previous year's Annual Report to the Attorney General and the Office of Government Information Services (OGIS), and proactive disclosures. These reports allow the Chief FOIA Officer to identify surges and bottlenecks at Component FOIA Offices that might contribute to a backlog increase, and to work with the Component FOIA Officers to address these issues. The DHS Privacy Office also holds monthly calls with Component FOIA Officers to discuss management and policy issues, and in January 2019 established the DHS FOIA Council. The Council is a forum for coordinating cross-component challenges and developing solutions.

The DHS Privacy Office frequently provides Components with management and processing support, and assists Components with backlog reduction efforts. A noteworthy example is the DHS Privacy Office's partnership with OBIM. Between FY 2014 to FY 2017 the number of requests submitted to OBIM drastically increased from approximately 7,000 to over 26,000 requests. To handle this increase in demand, in FY 2016 the DHS Privacy Office partnered with OBIM leadership to execute an aggressive 40-day Backlog Reduction Plan that resulted in a 75 percent reduction in OBIM's backlog, which resulted in a 26 percent reduction in DHS's overall backlog. The DHS Privacy Office has continued to partner with OBIM to control the backlog, and, as a result of the positive working relationship, efforts are underway to transfer the OBIM FOIA program to the DHS Privacy Office. Another example is the DHS Privacy Office's intensive backlog reduction efforts in collaboration with CBP and ICE – that eliminated approximately 6,000 requests from the DHS backlog at the end of FY 2018.

Components also regularly undertake efforts to reduce the backlog, including hiring contractors, authorizing overtime, and initiating a surge as the end of the fiscal year draws near. In one notable example, in FY 2015, ICE eliminated its backlog of about 60,000 requests using a contract valued at $6.2 million. ICE's efforts resulted in a decrease of more than 99 percent in its backlog and contributed to the overall decrease of the DHS backlog by 66 percent.

Figure 4: DHS & Select Components Backlog, FY08 – FY18




Since FY 2015, ICE has supplemented its processing with additional contract support and has maintained its relatively low backlog. However, ICE's success highlights the difficulty of maintaining backlog reductions through Component-led backlog reduction efforts. Between FY 2014 and FY 2016, the number of requests submitted to USCIS increased by 22 percent, contributing to an increase in the Department's overall backlog.

## Implementing the Backlog Reduction Roadmap

There is no easy remedy for reducing the DHS FOIA backlog. The solutions Components regularly rely on – hiring contractors, authorizing overtime, and initiating a surge as the end of the fiscal year draws near —only serve to improve statistics temporarily. The number of

requests received by DHS is likely to continue to increase, and the challenges faced by the Components will continue to grow.

The DHS FOIA Backlog Reduction Plan 2020 - 2023 lays out goals and a sustainable course for containing and reducing the age of the backlog in the short-term, and sustainably lowering the size of the backlog over the next three to five years. Over the past 15 years, the underlying causes of the backlog, including decentralization, technology and interoperability limitations, and staffing and resource constraints, have caused wide fluctuation in the size of the backlog and brought negative attention to the Department. This inability to control the backlog has sparked seven Government Accountability Office (GAO) engagements,[3] three Inspector General engagements,[4] eight OGIS engagements,[5]

---

[3] GAO-18-365: FOIA: Agencies Are Implementing Requirements but Additional Actions Are Needed. Published: Jun 25, 2018. (https://www.gao.gov/products/GAO-18-365); GAO-16-667: FOIA: Litigation Costs For Justice and Agencies Could Not Be Fully Determined. Published: Sep 8, 2016. (https://www.gao.gov/products/GAO-16-667); GAO-15-82: FOIA: DHS Should Take Steps to Improve Cost Reporting and Eliminate Duplicate Processing. Published: Nov 19, 2014. (https://www.gao.gov/products/GAO-15-82); GAO-12-828: FOIA: Additional Actions Can Strengthen Agency Efforts to Improve Management. Published: Jul 31, 2012. (https://www.gao.gov/products/GAO-12-828); GAO-09-260: FOIA: DHS Has Taken Steps to Enhance Its Program, but Opportunities Exist to Improve Efficiency and Cost-Effectiveness. Published: Mar 20, 2009. (https://www.gao.gov/products/GAO-09-260); GAO-08-344: Agencies Are Making Progress in Reducing Backlog, but Additional Guidance Is Needed; Published: Mar 14, 2008. (https://www.gao.gov/products/GAO-08-344); and GAO-06-20: FOIA: Improvements Needed to Address Backlogs and Ensure Quality. Published: December 21, 2005. (https://www.gao.gov/products/GAO-06-20).

[4] OIG-18-085-ISP-PRIV (ongoing); OIG-17-116-VR, "DHS Review of Responses to Significant Freedom of Information Act Requests." Published September 29, 2017. (https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-116-VR-Sep17.pdf ); and OIG-11-67, " The DHS Privacy Office Implementation of the Freedom of Information Act." Published March 11, 2011. (https://www.oig.dhs.gov/reports/2011-03/dhs-privacy-office-implementation-freedom-information-act/oig11-67mar11)

[5] "U.S. Citizenship and Immigration Services: Efficient FOIA Process Supported by Strong Management and Customer Service; Investments in Technology Can Further Improve Performance" Office of Government Information Services, National Archives and Records Administration. Published: February 9, 2018. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/uscis); "Privacy Office Meets Chief FOIA Officer Responsibilities by Aiding FOIA Implementation and Oversight and Supporting Customer Service" Office of Government Information Services, National Archives and Records Administration. Published: December 27, 2016. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/chief-foia-officer); "U.S. Immigration and Customs Enforcement: Strong Management, Innovative Use of Technology, and Suggested Improvements to Customer Service" Office of Government Information Services, National Archives and Records Administration. Published: October 18, 2016. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/ice); "United States Secret Service: Management Controls, Technology Support, and Improved Communication Needed" Office of Government Information Services, National Archives and Records Administration. Published: July 27, 2016. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/usss); "U.S. Customs and Border Protection: Good Management Practices in Place; Clear Communication and Increased Technology Use Needed" Office of Government Information Services, National Archives and Records Administration. Published: March 9, 2016. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/cbp); "U.S. Transportation Security Administration: Management Oversight, Training on Technology Use, and Clear Communication with Requesters Needed" Office of Government Information Services, National Archives and Records Administration. Published: January 11, 2016. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/tsa); "United States Coast Guard: Effective Management of Decentralized Program, Better Use of Technology, and Improved Communication with Requesters Needed" Office of Government Information Services, National Archives and Records Administration. Published: September 25, 2015. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/uscg); and

two Congressional hearings,[6] and countless media stories. In order to be successful, the plan addresses the underlying causes of the backlog by calling for: the creation of organizational performance metrics; improved service to our stakeholders; investment in and leveraging of technology; improved workforce engagement and planning; and undergirding FOIA operations with sound policy.

## FOIA Backlog Reduction Goals

In order to improve service to the public, the DHS FOIA program needs a unified approach that accounts for differences in the type and volume of requests received across the agency. In February 2019, the DHS Privacy Office created a blue-print for this unified approach by issuing FOIA performance metrics for Components. The goal of the metrics, which were influenced by discussion with Component FOIA Officers, is to set challenging, but achievable, backlog reduction goals.

In the June 2018 GAO report, "FOIA: Agencies Are Implementing Requirements but Additional Actions Are Needed,"[7] evaluating progress by agencies in implementing the FOIA Improvement Act of 2016, GAO recommended that performance metrics are valuable for assessing the effectiveness of backlog reduction efforts and ensuring that senior leadership supports backlog reduction efforts. The goal of DHS's performance metrics is two-fold: to set clear expectations for Component FOIA performance, and to assist Component leadership and FOIA Officers in assessing any additional resources needed to achieve backlog reduction.

While we expect the performance metrics to be an important aspect of improving our service to the public, DHS must also address some of the issues with decentralized operations that have frustrated past backlog reduction efforts. Components have independent responsibility for establishing, operating, and appropriately resourcing their FOIA operations, subject to oversight by the DHS Privacy Office. Decentralization of the FOIA program at the Department causes problems in program coordination and workforce management, making it difficult for the DHS FOIA enterprise to share manpower, coordinate surge efforts, and plan for future challenges.Key to addressing some of the challenges created by decentralized operations is clarifying the DHS Chief FOIA Officer's authorities and delineating Component responsibilities through management policies, directives, and instructions.

As noted previously, the Department's progress has been overcome by continual increases in demand. In order to be successful, the DHS FOIA program must continue to evolve. The Department's FOIA vision is to embrace modern workforce and information management techniques, leverage technology, enhance our systems and rebuild our processes, to create a modern, mature, and sustainable FOIA program. The benefits of modernization and maturation will be shared by members of the public and our staff, and allow the agency to focus its attention

"Federal Emergency Management Agency: Management Controls, Better Use of Technology, and Improved Communication with Requesters Needed" Office of Government Information Services, National Archives and Records Administration. Published: September 18, 2015. (https://www.archives.gov/ogis/foia-compliance-program/agency-compliance-reports/dhs/fema)

[6] "Ensuring Compliance with the Freedom of Information Act" House Committee on Oversight and Government Reform. June 3, 2015. (https://republicans-oversight.house.gov/hearing/ensuring-agency-compliance-with-the-freedom-of-information-act-foia/); and "Why Isn't the Department of Homeland Security Meeting the President's Standard on FOIA?" House Committee on Oversight and Government Reform, March 31, 2011. (https://fas.org/sgp/congress/2011/dhs-foia.pdf)

[7] *See:* https://www.gao.gov/products/GAO-18-365.

on its mission-critical operations. The figure below illustrates the five goals to achieve a sustainable FOIA operation.

| DHS FOIA Backlog Reduction Goals |
| --- |
| Goal 1: Improve Service to the Public by: |
| -Reducing High-volume Component FOIA Backlogs by 10 percent<br>-Reducing Low-volume Component FOIA Backlogs by 15 percent<br>-Responding to FOIA Requests in a Consistent Timely Manner<br>-Reducing the Age of Open Requests<br>-Adopting Coordinated and Disciplined Approaches to Backlog Reduction Efforts |
| Goal 2: Improve Service to the Department by: |
| -Increasing Stakeholder Satisfaction with Reliability, Security, Privacy, and Responsiveness<br>-Mitigating Risks<br>-Enabling Faster, More Accurate and Better Documented Decisions<br>-Improving Data Reliability and Consistency |
| Goal 3: Improve FOIA IT Infrastructure by: |
| -Eliminating Duplication of Efforts by Reducing the Number of Systems Used to Process FOIA Requests<br>-Ensuring Interoperability between Solutions to Enable Faster and More Accurate Processing<br>-Promoting the Use of Artificial Intelligence (AI) to Enable a Quicker Path to New Capabilities<br>-Increasing Use of Shared Resources<br>-Fostering Innovation to Improve Operational Efficiency |
| Goal 4: Improve FOIA Workforce Engagement by: |
| -Demonstrating Investment in Front-line Employees<br>-Establishing Government Information Specialist (FOIA) Career Paths<br>-Automating Routine Work So Employees Can Focus on the More Complex Tasks<br>-Changing the Culture of the FOIA Employee/Stakeholder Relationship |
| Goal 5: Strengthen the Regulatory and FOIA Policy Framework by: |
| -Clarifying and Delineating Authorities and Responsibilities<br>-Solidifying FOIA Officer Relationships<br>-Establishing a DHS FOIA Compliance and Oversight Program |

## Goal 1: Improve Service to the Public by:

-Reducing High-volume Component FOIA Backlogs by 10 percent

-Reducing Low-volume Component FOIA Backlogs by 15 percent

-Responding to FOIA Requests in a Consistent Timely Manner

-Reducing the Age of Open Requests

-Adopting Coordinated and Disciplined Approaches to Backlog Reduction Efforts

### Reducing High-volume Component FOIA Backlogs by 10 percent

In FY 2018, more than 90 percent of the requests submitted to DHS were directed to USCIS, CBP, ICE, and OBIM. These Components primarily process first-party requests for immigration-related records. These Components also hold the largest portion of the DHS backlog: in FY 2018, USCIS, CBP, ICE, and OBIM held 92 percent of the Department's backlog.

In order to successfully reduce the backlog, these high-volume Components will need to increase production to both reduce the backlog and keep up with continued increases in the number of requests received. An annual 10 percent reduction in the backlog at high-volume Components provides these Components with the flexibility necessary to make any necessary changes to processes and advocate for needed resources.

Figure 5: DHS Backlog Composition by Percentage FY09 – FY18



### Reducing Low-volume Component FOIA Backlogs by 15 percent

The number of requests received annually by low-volume Components ranges from a few hundred to 5,000. CISA, FEMA, the DHS Privacy Office, TSA, USCG, and USSS receive an average of between 500 to 5,000 requests per year. The remaining Component FOIA Offices – the Federal Law Enforcement Training Centers (FLETC), the Office of Intelligence and Analysis (I&A), Office of Inspector General (OIG), and the Science and Technology Directorate (S&T) – receive an average of only a few hundred requests each year.

Figure 6: Non-Immigration Components Received, Processed, Backlog, Pages Released




Under the Open Government Directive, the Office of Management and Budget requires that all agencies with a substantial backlog reduce the backlog by at least 10 percent annually.[8] Setting a more aggressive target for Components that receive low-volume requests is warranted to address the disparity in the ratio of requests received to backlog at some of the low-volume Components compared to the high-volume Components: as illustrated by Figure 6, whereas the backlog accounts for between approximately 10 to 20 percent of the number of incoming requests at high-volume Components, the ratio of backlog to incoming requests surpasses 50 percent at some of the low-volume Components. As depicted in Figure 6, the low-volume Components with the largest backlogs release on average a relatively small number of pages Further, as depicted in Figure 7 below, several low-volume Components hold a disproportionate number of the oldest requests in the backlog – for example, while USCG held only two percent of the FOIA backlog at the end of June 2019, it held 17 percent of requests more than 200 days old.

[8] *See*: https://obamawhitehouse.archives.gov/open/documents/open-government-directive.

Figure 7: Proportion of Backlog and Proportion of Backlog More than 200 Days Old




## Responding to FOIA Requests in a Consistent Timely Manner

DHS will continue to drive down the average response time for simple and complex requests through process improvements and utilizing advanced technology to dramatically improve search capabilities and decrease review time. In FY 2018, DHS responded to simple requests in an average of 27 days – a reduction of 30 percent compared to an average response time of 39 days in FY 2017. DHS responded to complex requests in an average of 80 days in FY 2018, a decrease of 15 percent compared to an average response time of 94 days in FY 2017.

## Reducing the Age of Open Requests

While driving down response time, DHS will also focus attention on ensuring the Department is reducing the over-all age of requests. In addition to stressing the importance of closing out the 10 oldest requests in the Department, DHS set an aggressive performance metrics goal that requires Components to reduce the number of open requests more than 200 days old by 15 percent.

## Adopting Coordinated and Disciplined Approaches to Backlog Reduction Efforts

As discussed earlier, there is no easy remedy for reducing the DHS FOIA backlog. The solutions Components regularly rely on – hiring contractors, authorizing overtime, and initiating a surge as the end of the fiscal year draws near —only serve to improve statistics temporarily. Additionally, these efforts can have negative effects on the backlogs at other Components or agencies if they drive up the number of referrals. Because A-Files held by USCIS include records generated by other Components and agencies – particularly ICE and CBP – DHS FOIA statistics show a spike in the backlog at ICE and CBP in the year following a backlog reduction at USCIS. The backlog at ICE and CBP will then decrease as the backlog at USCIS increases, allowing ICE and CBP to address other requests in their backlogs. Going forward, the Department and Components will use this plan to coordinate its backlog reduction efforts.




*Requests for immigration files often lead to referrals to other Components.*

## Goal 2: Improve Service to the Department by:

-Increasing Stakeholder Satisfaction with Reliability, Security, Privacy, and Responsiveness

-Mitigating Risks

-Enabling Faster, More Accurate and Better Documented Decisions

-Improving Data Reliability and Consistency

A mature DHS FOIA program will better serve the business needs of the Department, freeing up personnel to concentrate on mission-critical activities and improving the security of sensitive information. The DHS Privacy Office will put modern management and information management tools and practices in place that will mitigate the risk of inadvertent or accidental disclosures, and the risks associated with FOIA litigation. Additionally, the mature FOIA program will increase public trust in the agency's actions by advancing transparency and public understanding.

### Increasing Stakeholder Satisfaction with Reliability, Security, Privacy, and Responsiveness

The DHS Privacy Office will issue policies and management best practices that will improve operations and increase stakeholder satisfaction with reliability, security, privacy, and responsiveness of the program. This will enable DHS operators and leadership to focus critical resources on the mission of the agency.

Key to this effort will be input, buy-in, and cooperation from the DHS FOIA Council. In November 2018, the DHS Chief FOIA Officer signed the DHS FOIA Council Charter. The purpose of the Council is to advise the Chief FOIA Officer on policy and management matters concerning the departmental FOIA Line of Business function. The Council, which meets on a quarterly basis, is chaired by the Chief FOIA Officer, and co-chaired by the Deputy Chief FOIA Officer. General membership is comprised of Component FOIA Officers. The DHS Privacy Office provides an executive secretary and other staff as required to support Council meetings. The Council provides a forum for sharing FOIA best practices and for coordinating cross-component challenges and developing solutions. As a matter of policy and to ensure independence, the OIG declined to participate in the Council.

The Council Charter also gives Council members the responsibility for setting the strategic agenda for Council activities, including identifying common interests or common needs of the FOIA community and setting goals and performance measures. Additionally, the Council Charter provides the Chair with the responsibility to provide directions and final decisions on all FOIA issues before the Council after discussion, and to seek to resolve or mitigate any concerns or objections before final decisions are made.

The Council Charter enables the creation of standing and ad hoc committees as required to study emerging priorities. Members of the Council are required to be the head of any committee

created by the Council, and Council members and staff may serve on a committee. The committee can submit reports to be made available to all Council members.

The Council currently has four Committees: Technology, which is focused on interoperability, creation of systems, and computer-assisted review; DHS FOIA Employee Development, which is focused on training, performance plans, community of practice, and awards programs; Policy, which is focused on policy development and templates; and Backlog, which is focused on the backlog reduction plan and DHS FOIA performance metrics. The topics that the Committees are dedicated to reflect much of the work needed to mature DHS FOIA operations in ways that will increase stakeholder satisfaction with reliability, security, privacy, and responsiveness of the program. In particular, the Committees will address employee management and development issues and FOIA policy. We expect the Committees will provide valuable insight and create buy-in for agency actions to take the steps necessary to appropriately mature the FOIA program management.

### Mitigating Risks

The DHS Privacy Office will leverage modern technology to improve the security of sensitive DHS information. This will be accomplished by procuring an enterprise-wide FOIA processing solution that meets the demands of a modern FOIA process, reducing the number of FOIA processing solutions in use, and ensuring all systems are interoperable. In 2019, the DHS FOIA Technology System Requirements Working Group issued requirements for an appropriate enterprise-wide FOIA processing solution to accomplish this goal; OGIS cited the working group's efforts as a notable best practice in its report, "Leveraging Technology to Improve Freedom of Information Act (FOIA) Searches."[9] Currently, responsive records are maintained and processed in Component silos. Traditionally, Components created these silos as a way to secure sensitive information by limiting access, even within the agency. An unforeseen consequence of this siloed approach is that Components can inadvertently release information that is sensitive or somehow compromises another Component's operations due to a lack of awareness between information within various Department records. For example, a Component may not recognize another Component's equity in certain records, or recognize a need to consult with another office before making a disclosure.




*This image shows that FOIA analysts will sometimes make very different release decisions concerning the same document.*

Improving understanding of the breadth of information that flows through the Department's FOIA offices will also allow the Department to more precisely gauge the potential risks associated with the release of information. Courts have long recognized the mosaic theory as justification for agencies to withhold information that at first glance may not seem sensitive, but would reveal classified or otherwise sensitive information when combined with other material. In the wake of the 9/11 terrorist attacks, Courts continued to defer to agency judgement

[9] *See*: https://www.archives.gov/files/ogis/assets/leveraging-technology-to-improve-foia-searches-31-july-2019-final.pdf.

regarding the threats to national security and Congress expanded agencies' ability to withhold potentially sensitive information from records. The increase in the release of digital documents and growth in digital sources of open source information aggravates this risk. The growth in available information about agency operations makes it increasingly easy for those outside of government, including foreign adversaries or people who would like to harm the nation's interest, to "unmask" information that has been redacted from a document.

Processing records in an enterprise-wide or interoperable environment will also improve the consistency of redactions. Currently, a Component may release similar agency records with different redactions, which is not only embarrassing to the agency but can reveal information intended to be protected. An enterprise-wide solution that is interoperable with other systems will increase the agency's ability to manage its information and keep informed of information that has been released and withheld.

### Enabling Faster, More Accurate and Better Documented Decisions




*Advanced E-discovery tools are useful throughout the FOIA process.*

The DHS Privacy Office will integrate the use of E-discovery, AI and other technological solutions to reduce processing time, increase the accuracy of redactions, and create a strong administrative record. The benefits of these powerful tools will be shared across the agency through the enterprise-wide FOIA processing solution.

The DHS 2019 Chief FOIA Officer Report[10] documents some of the benefits of using E-discovery tools to reduce the FOIA workload by culling, de-duplicating records, threading e-mails, and narrowing large record sets based on key terms. The report highlights how CISA used the tools to reduce 47,439 individual files to 42 pages of records. This process took the software approximately one working day to run in the background, whereas it would have taken a team of employees a number of months to complete the same task with less accuracy. Additionally, the report notes that USCIS used these tools to narrow the universe of potentially responsive records from 15,000 down to 800, saving countless processing hours. USCIS also used these tools to reduce 81,987 pages of e-mails to 4,016 pages of e-mails that are responsive records, reducing the manual review of e-mails for responsive records by 95 percent and saving the government hundreds of hours in labor. While these tools are particularly useful for processing email, the same benefits apply to any electronic records, or any record that has been digitized at a high enough resolution to be read by the system. At the present time, only some Components have access to these tools, or they have agreements in place that only allow them to access these tools for certain types of cases or in litigation. By integrating these tools into the enterprise-wide solution, DHS will ensure that all Components using the system have the capability to leverage these tools to improve the process. The enterprise-wide solution will also ensure information documenting the agency's actions associated with a FOIA request are easily and consistently captured. The administrative record of a FOIA request is particularly important if the requester files an administrative appeal or

---

[10] *See*: https://www.dhs.gov/sites/default/files/publications/2019_chief_foia_officer_report_april_2019.pdf.

litigation. Automatically capturing administrative information about the processing of requests across the agency will ease the FOIA administrative burden, and ensure that the agency is well-prepared should it have to defend its actions in court.

### Improving Data Reliability and Consistency




*An enterprise-wide solution will improve the consistency of DHS FOIA operations and data quality.*

DHS will improve data reliability and consistency by reducing the number of FOIA processing solutions in use and making systems interoperable. This will ensure that DHS has reliable and up-to-date information regarding FOIA needs and can move resources appropriately to meet these needs. In addition to leading to better internal management, the enterprise-wide solution will improve confidence in the annual FOIA statistics publicly reported to DOJ and available via FOIA.gov.[11] These numbers are regularly used by Congress, the news media, researchers, and the general public to measure DHS's FOIA performance.

As discussed previously, the solution will also allow the Department to better understand and compare information that flows through the Department's FOIA offices. This will enable the DHS Chief FOIA Officer to highlight potential inconsistencies in the ways that the agency is measuring, storing, reporting, and using its information. The DHS Privacy Office will act as an early alarm system for DHS leadership to these issues, and ensure that the agency is able to address efficiently address inconsistencies.

[11] *See*: https://www.foia.gov/.

## Goal 3: Improve FOIA IT Infrastructure by:

-Eliminating Duplication by Reducing the Number of Systems Used to Process FOIA Requests

-Ensuring Interoperability between Solutions to Enable Faster, More Accurate Processing

-Promoting the use of AI to Enable a Quicker Path to New Capabilities

-Increasing Use of Shared Resources

-Fostering Innovation to Improve Operational Efficiency

While technology is not a silver bullet for improving the implementation of FOIA, it can be leveraged to address some of its associated problems. In particular, agencies have had significant success in using technology to reduce the administrative burden associated with tracking FOIA requests by adopting automated tracking solutions and allowing requesters to directly input requests electronically, which shifts the administrative burden of entering information into the solution from the agency to the requester. Agencies, including DHS Components, have also used powerful AI and computer-assisted-review tools to dramatically improve the process of searching and reviewing electronic records.

DHS is a leader in using technology to improve the FOIA process. In 2011, the DHS Privacy Office stood up a FOIA tracking and processing solution, allowing Components to use the solution at no cost for a period of five years. This solution is currently used in 10 of DHS's 13 Components.[12] The solution significantly improved DHS's ability to track requests across the Department, and DHS made full use of the solution's management tools to ensure that processes were operating at peak efficiency, which was key to the FOIA program's ability to dramatically increase the number of requests processed each year.

Since the adoption of the solution currently used by most of the Components, business operations have continued to evolve – increasing the type and number of digital records created by business operations – and the technological tools available have continued to evolve. DHS will build on its success using technology in the FOIA process to update our FOIA IT infrastructure and build a FOIA program that meets the needs the Department.

### Eliminating duplication by reducing the number of systems used to process FOIA requests

DHS will consolidate the number of FOIA processing solutions at the agency and make all solutions interoperable, eliminating duplicative administrative work and freeing up manpower to focus on processing requests and reducing the backlog. The solution will meet all applicable

[12] The FOIA tracking and processing solution is currently used by CISA, FEMA, FLETC, I&A, ICE, OIG, DHS Privacy Office, S&T, TSA, and USCG.

security and accessibility requirements,[13] and better serve the Department's needs to process a large volume of records.

The Department Components currently pay for the use and maintenance of four different automated FOIA tracking and processing solutions.

- USCIS recently developed and launched an in-house solution, FOIA Immigration Records SysTem (FIRST). FIRST is intended to serve the needs of USCIS's general customer base of requesters seeking records in A-Files. FIRST allows requesters to electronically input requests and download documents, significantly reducing USCIS's administrative burden. Since A-Files are mostly paper-based, documents are primarily scanned into FIRST for processing, though some electronic records are ingested; the resolution USCIS currently uses for scanning does not enable the use of keyword searches or more advanced computer-assisted review technologies. Scanned images like the ones processed through FIRST are also much larger than documents that are maintained in their digital format, increasing the costs associated with the system's storage.
- CBP uses FOIAonline, which is a tracking solution developed by the U.S. Environmental Protection Agency (EPA) and used by several agencies. FOIAonline includes an electronic method for requesters to directly submit requests and receive documents, and allows requesters to create an account. FOIAonline also includes tracking features. Records are processed outside of the system using tools like Adobe, and processors must input information about the records processed, such as exemptions used and pages released, into the system.




*FOIA processing solutions currently in use at DHS are not interoperable, leading to the duplication of administrative work.*

- The DHS Privacy Office and remaining Components with the exception of USSS use a commercial-off-the-shelf (COTS) product. The DHS Privacy Office manages the licenses and contract for use of the COTS product by participating Components. This product includes tracking and processing tools; if a processor uses the processing tools integrated into the system, information such as exemptions used and pages released are automatically captured. The COTS product can support electronic submission of requests and delivery of documents; the DHS Privacy Office intends to include these features in the near future.

[13] *See*: https://www.gao.gov/products/GAO-15-82.

- USSS maintains a separate instance of the same COTS product in use at the DHS Privacy Office. USSS is responsible for paying for any upgrades to its version of the product, and for needed technical support.

Because these solutions are not interoperable, any request involving a referral – which is extremely common when processing information commonly found in A-Files – must be logged in and acknowledged multiple times.[14] This unnecessary administrative work is a drain on the DHS workforce, and will alleviate the need for service level agreements between Components to process records located in A-Files.[15] Interoperable solutions will free up manpower to focus on processing and reducing the backlog.

DHS's vision for an enterprise-wide FOIA processing solution further reduces the need to direct manpower towards administrative tasks and instead focus on backlog reduction by allowing requesters to directly input requests into the system electronically. This solution will also benefit DHS by enabling the DHS Privacy Office to seamlessly shift resources at the request of a Component to address an influx in requests or a particular backlog reduction effort, streamlining reporting processes and improving oversight, reducing operating and storage costs, and improving technology support across the agency.

### Increasing Efficiency by Ensuring Interoperability between Solutions to Enable Faster, More Accurate Processing

DHS will process records more efficiently and accurately by making FOIA processing solutions interoperable. As previously discussed, leveraging AI in an interoperable environment will mitigate the risk of inadvertently releasing sensitive information. AI will also allow records to be processed more quickly and with greater accuracy. AI can automatically redact information that should never be released, like Social Security numbers, detect patterns that indicate information should be protected from release, and highlight that information for processors. These advanced tools allow processors to focus their time and efforts on more complex release decisions.

---

[14]GAO-15-82: FOIA: DHS Should Take Steps to Improve Cost Reporting and Eliminate Duplicate Processing. Published: Nov 19, 2014. (https://www.gao.gov/products/GAO-15-82)
[15] GAO-15-82: FOIA: DHS Should Take Steps to Improve Cost Reporting and Eliminate Duplicate Processing. Published: Nov 19, 2014. (https://www.gao.gov/products/GAO-15-82)

### Promoting the Use of AI to Enable a Quicker Path to New Capabilities

DHS will procure an enterprise-wide FOIA processing solution that expands the availability of AI and computer-assisted review tools –and the time-saving benefits of these tools—across the agency. As previously discussed, Components have successfully used AI and E-discovery tools to improve searches and save significant hours in labor. Expanding access to these tools will enable all Components to reap these benefits, allowing processors to work more efficiently and reduce the backlog.

### Increasing Use of Shared Resources

DHS will identify technology challenges and opportunities to share resources across Components. Technological tools can be prohibitively expensive for Components, particularly smaller Components that have less FOIA demands. Additionally, Components might only occasionally need access to a tool that requires a large investment and annual upkeep costs. Sharing these resources saves the agency valuable resources and reduces the administrative work required for Components to identify, procure, and maintain their own tools.




*Sharing technology services benefits the Department by reducing costs and improving services.*

### Fostering Innovation to Improve Operational Efficiency

DHS will continually look for methods to improve operations and recognize and reward innovations that improve operational efficiency. Our employees bring a wealth of insight and experiences to DHS FOIA operations and often make suggestions that improve our processes. In 2019, the DHS Privacy Office presented the 2019 Sunshine Award for Exceptional Service by a FOIA Professional at the General Schedule GS-7 or GS-9 level to an employee who proposed, developed, and implemented a new process that significantly decreased the FOIA team's dependence on an external database; this innovation saved OBIM significant processing time and contributed to keeping OBIM's backlog at a very low level. DHS will continue to welcome new ideas and innovations and recognize employees for their contributions.

## Goal 4: Improve FOIA Workforce Engagement by:

-Demonstrating Investment in Front-line Employees

-Establishing Government Information Specialist (FOIA) Career Paths

-Automating Routine Work Enabling Employees to Focus on the More Complex Tasks

-Changing the Culture of the FOIA Employee/Stakeholder Relationship

DHS recognizes the value of our FOIA employees and commits to creating a dynamic work environment that provides them with the resources and support necessary to succeed. DHS will accomplish this by showing our FOIA employees we value their contributions and investing in the workforce, creating a sustainable staffing model for DHS Component FOIA Offices establishing a career ladder that rewards talented employees, lowering the administrative burden of the FOIA staff, and setting FOIA employees up to have productive relationships with our requesters.

### Demonstrating Investment in Front-line Employees

DHS will improve workforce engagement by providing front-line employees and supervisors with resources to support their success and highlighting their accomplishments. This investment in FOIA employees will improve performance by providing targeted training and making resources readily available and contribute to strong employee morale.

The DHS Privacy Office will create opportunities for Component FOIA Officers to provide FOIA employees with targeted, DHS-specific training on disclosure issues. In addition to improving understanding of DHS's policies and practices, these training sessions will allow Component FOIA employees to learn more about operations at other Components and exchange best practices.




*Building a DHS FOIA Community of Practice will improve consistency of FOIA operations across DHS.*

The DHS Privacy Office will also assist Component FOIA employees and Officers by expanding the DHS FOIA Employee Resources page on the Department's intranet site, which is accessible to all Department employees. This internal site includes links to resources, DHS FOIA policies, highlights DHS-wide FOIA training opportunities, and is a repository for DHS-specific training materials. The DHS Privacy Office will continue to build out the page to address common issues that DHS FOIA employees face and create an online community of practice for employees to use for guidance. The DHS Privacy Office will also work with Component FOIA Officers to develop and promote best practices for FOIA program management. The DHS Privacy Office will also make available resources to assist

Component FOIA Officers, including sample FOIA performance metrics, and examples of leadership awareness reports.

The DHS Privacy Office will also continue to promote the Sunshine Awards Program. This program recognizes exceptional DHS FOIA employees at the GS-7 through GS-15 level. In addition to presenting the awards to these employees during Sunshine Week, the DHS Privacy Office will recognize them on the DHS FOIA Employee Resources page throughout the year, and alert agency and Component leadership about the work that earned the special recognition. The DHS Privacy Office will also look for ways to recommend exceptional FOIA employees for awards outside of the organization, such as through awards programs run by DOJ OIP and other professional organizations.

### Establishing Government Information Specialist (FOIA) Career Paths

DHS will create a sustainable staffing model for Component FOIA Offices and establish a career path that allows FOIA employees to advance their careers within DHS. This will ensure that the FOIA program's footprint on the agency is the correct size and that DHS can attract and retain talent.

Adding additional FOIA employees is a common backlog reduction strategy and does generally result in more requests processed each year. However, adding employees does not always have the expected outcome. In particular, DHS has struggled to maintain productivity levels when additional employees are added to the staff. DHS reached its highest FOIA staffing level in FY 2013 with a FOIA staff of 604; during that reporting period DHS processed about 338 requests per member of the staff, a similar number to the amount of requests processed per staff member in FY 2018, when DHS had its lowest level of FOIA staffing (319). In FY 2017, DHS had a FOIA staff of 552 and processed almost 667 FOIA requests per staff member.

Figure 8: DHS Staffing and Requests Closed per FOIA Staff Member



# DHS FOIA Staffing




*Snapshot of DHS FOIA staffing as of June 25, 2019.*

A DHS FOIA staffing model will ensure that DHS maintains productivity and assist Components in adequately staffing FOIA Service Centers. The model will be based on improved reporting of FOIA costs that include salaries, employee benefits, non-personnel direct costs, indirect costs, and cost for other offices,[16] and take into account metrics that better capture the amount of work required to process a request – including the number of pages reviewed and amount of information redacted – and take into account factors like the complexity and sensitivity of a Component's records, the Component's risk threshold, and the impact of the use of contractors. The DHS Privacy Office will also look at the quality of data currently collected to measure FOIA staff productivity and recommend practices that ensure the data is continuously evaluated and reflective of the work completed by FOIA staff.

The DHS Privacy Office will also work with Components to create a common career ladder for Government Information Specialists. The career ladder will take advantage of the broad range in the type and complexity of records commonly processed at Components to allow employees to progress in their careers. This will help ensure that DHS benefits from the early investments and training provided to employees, and that DHS is in a better position to recruit and retain employees.

### Automating Routine Work Enabling Employees to Focus on the More Complex Tasks

As previously discussed, DHS will automate routine work to allow employees to focus on more complex tasks. Relieving employees of the administrative burden also furthers the professionalization of the Government Information Specialist job series. DHS will accomplish this by enabling requesters to submit requests electronically thereby reducing duplicate FOIA requests and looking for other ways to streamline administrative processes.

### Changing the Culture of the FOIA Employee/Stakeholder Relationship

DHS will give FOIA employees the resources and support necessary to effectively collaborate with requesters. The DHS Privacy Office will ensure that Component FOIA Public Liaisons[17] and front-line employees have opportunities to develop and hone skills that help them develop strong working relationships with requesters. These opportunities will include training sessions in dispute resolution skills through the OGIS, sharing guidance and best practices in communication from the DOJ OIP, and informal brown bags with members of the requester community.

---

[16]GAO-15-82: FOIA: DHS Should Take Steps to Improve Cost Reporting and Eliminate Duplicate Processing. Published: Nov 19, 2014. (https://www.gao.gov/products/GAO-15-82)

[17] *Openness Promotes Effectiveness in our National Government Act of 2007*, Pub. L. No. 110-175, 121 STAT. 2524 (Dec. 31, 2007).

## Goal 5: Strengthen the FOIA Policy and Oversight Framework

-Clarifying and Delineating Authorities and Responsibilities

-Solidifying FOIA Officer Relationships

-Establishing a DHS FOIA Compliance and Oversight Program

### Clarifying and Delineating Authorities and Responsibilities

DHS will clarify the authority of the Chief Privacy Officer with respect to carrying out the various duties of the DHS Chief FOIA Officer, and delineate the responsibilities of the DHS leadership, Component leadership, the DHS Privacy Office, and Component FOIA Officers. This will improve the quality and consistency of DHS FOIA policies and practices, and enable the DHS Privacy Office to better coordinate agency actions to address the backlog.

Under DHS Delegation Number 13001, "Delegation to the Chief Privacy Officer," dated August 29, 2011, and DHS Directive Number 262-11, "Freedom of Information Act Compliance," dated April 17, 2017, the DHS Chief Privacy Officer is the Department's Chief FOIA Officer.[18] Agency Chief FOIA Officers have statutory responsibility for monitoring FOIA operations across the Department and recommending adjustments to agency practices, policies, personnel, and funding as may be necessary to improve performance, providing FOIA-related training, and preparing the required annual reports on the Department's FOIA performance.[19] While Components are subject to the oversight of the Chief Privacy Officer, operations at DHS are decentralized and DHS Components are responsible for establishing and maintaining their own FOIA programs. Past Component-led efforts to address the backlog have had short-term benefits, but a lack of central coordination leads to the backlog increase at other Components.

DHS will address the challenges created by decentralization by providing additional clarity around the role of the Chief Privacy Officer to more effectively carry out the statutory duties of the Chief FOIA Officer. Specifically, DHS will designate the Chief Privacy Officer to oversee the management of the DHS FOIA program, develop and issue guidance on FOIA procedures, and establish standardized processing solutions throughout the Department to improve compliance and coordination.

In addition to improving the coordination of backlog reduction efforts, clarifying the Chief Privacy Officer's role will improve the DHS Privacy Office's ability to plan for future challenges and ensure the DHS Privacy Office can provide guidance that will lead to a reduction in the number of FOIA processing solutions in use at the Department. The goal of the Chief Privacy Office is to reduce duplication of efforts, improve referrals and consultations, and share

[18] *See*: https://www.dhs.gov/foia-statutes-resources.
[19] *FOIA Improvement Act of 2016*, Pub. L. No. 114-185, 130 Stat. 538 (2016) (provisions codified at 5 U.S.C. § 552) and Pub. L. No. 110-175 (Dec. 31, 2007).

manpower. Further, these authorities will improve the quality of DHS-specific training, ensure consistency in disclosures, and increase compliance.

### Solidifying FOIA Officer Relationships

DHS will solicit input from Component FOIA Officers and earn buy-in on strategic decisions through the DHS FOIA Council. As previously noted, the Council Charter gives Council members the responsibility for setting the strategic agenda for Council activities, including identifying common interests or common needs of the FOIA community and setting goals and performance measures. Additionally, the Council Charter provides the Chair with the responsibility to provide directions and final decisions on all FOIA issues before the Council after discussion, and to seek to resolve or mitigate any concerns or objections before final decisions are made.

### Establishing a DHS FOIA Compliance and Oversight Program

The DHS Privacy Office will create a DHS FOIA Compliance and Oversight Program. This program will surface shared challenges across Components and encourage Components to implement best practices. The program will also alert the DHS Privacy Office to any emerging issues and allow the DHS Privacy Office to address these issues through the issuance of guidance or policies.

In FY 2018, Component FOIA Officers completed all 13 modules of the DOJ OIP Self-Assessment Toolkit, and the DHS Privacy Office reviewed and compiled results to identify shared challenges and best practices to improve the Department's FOIA performance. This notable effort created a baseline understanding of shared challenges and pointed towards initiatives that will help improve Component FOIA performance.




*The DHS FOIA Oversight and Compliance Program involves regular responses to DOJ Self-Assessment Modules, outside evaluations of DHS FOIA operations, and DHS-specific evaluations.*

The DHS Privacy Office will build on this investment by creating a robust FOIA Compliance and Oversight Program. This program will require that Component FOIA Officers complete certain sets of modules each year and submit the results to the DHS Privacy Office. Each Component must complete all of the modules within three years.

The DHS Privacy Office will supplement the self-assessment program with audit reports and evaluations completed by the DHS Privacy Office staff, the GAO, Component Inspectors General, and OGIS. Additionally, the DHS Privacy Office will develop modules tied to DHS-specific FOIA issues and policies.

## Conclusion

DHS is committed to building a modern, mature, and sustainable FOIA program by embracing a forward-looking workforce and information management techniques, leveraging technology, enhancing our systems, and rebuilding our processes. This mature FOIA program will include an improved IT infrastructure, a more engaged FOIA workforce, and a stronger FOIA policy and regulatory environment that better serves the needs of the public and the Department. As we carry out this plan, DHS FOIA will continue to look for innovative solutions to improve the process and strive to provide the highest level of service to stakeholders inside and outside of the government.

# EXHIBIT 4

OFFICE OF INSPECTOR GENERAL

# DHS' Process for Responding to FOIA and Congressional Requests

Homeland Security

July 23, 2020

OIG-20-56

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

July 23, 2020

MEMORANDUM FOR: Beth Spivey
Assistant Secretary
DHS Office of Legislative Affairs

Juliana Blackwell
Acting Executive Secretary
DHS Office of the Executive Secretary

Dena Kozanas
Chief Privacy Officer
DHS Privacy Office

FROM: Joseph V. Cuffari, Ph.D.
Inspector General

SUBJECT: *DHS' Process for Responding to FOIA and Congressional Requests*

Attached for your action is our final report, *DHS' Process for Responding to FOIA and Congressional Requests.* We incorporated the formal comments provided by your office.

The report contains no recommendations aimed at improving how DHS responds to Freedom of Information Act (FOIA) and congressional requests. Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jackson Eaton, Acting Assistant Inspector General for Special Reviews and Evaluations, at (202) 981-6000.

Attachment

# DHS OIG HIGHLIGHTS

## *DHS' Process for Responding to FOIA and Congressional Requests*

**July 23, 2020**

## Why We Did This Review

In response to a request from the Senate Homeland Security and Governmental Affairs Committee, Permanent Subcommittee on Investigations, we conducted a review of DHS' handling of Freedom of Information Act (FOIA) requests and congressional requests directed to the DHS Office of the Secretary — specifically, the DHS Secretary and Deputy Secretary.

## What We Recommend

This is a descriptive report and contains no recommendations.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

DHS outlines its process for responding to FOIA and congressional requests in internal policy and procedure documents, which include timeliness goals (some of which are based on statutory timelines) and other guidance for searching for, collecting, processing, and producing responsive materials. Regarding FOIA requests, while DHS generally met deadlines for responding to simple FOIA requests, it did not do so for most complex requests. A significant increase in requests received, coupled with resource constraints, limited DHS' ability to meet production timelines under FOIA, creating a litigation risk for the Department. However, despite the limitations, DHS FOIA response times are better than the averages across the Federal Government. Additionally, DHS has not always fully documented its search efforts, making it difficult for the Department to defend the reasonableness of the searches undertaken.

With respect to responding to congressional requests, DHS has established a timeliness goal of 15 business days or less. However, we found that, on average, it took DHS nearly twice as long to provide substantive responses to Congress, with some requests going unanswered for up to 450 business days. Further, DHS redacted personal information in its responses to congressional committee chairs even when disclosure of the information was statutorily permissible.

## DHS Response

DHS acknowledged FOIA backlogs remain a problem, despite increasing the number of requests processed. DHS stated its process for responding to congressional requests varies and that its redactions are appropriate.

## Table of Contents

Introduction .......... 2

Background .......... 2

Results of Review .......... 5

Resource Constraints Have Limited DHS' Ability to Respond to FOIA Requests Timely .......... 6

Components and OCIO Did Not Consistently Complete FOIA Search Forms to Indicate They Conducted a Reasonable Search .......... 11

DHS Often Exceeded Its Timeliness Goal When Responding to Congressional Requests and Redacted Information .......... 12

## Appendixes

Appendix A: Objective, Scope, and Methodology .......... 17
Appendix B: DHS Comments to the Draft Report .......... 19
Appendix C: Information Exempt from Disclosure under FOIA .......... 23
Appendix D: DHS Privacy Office FOIA Request Process and DHS Congressional Request Process .......... 24
Appendix E: FOIA Litigated Cases .......... 26
Appendix F: Major Contributors to This Report .......... 28
Appendix G: Report Distribution .......... 29

## Abbreviations

| | |
|---|---|
| ALJ | Administrative Law Judge |
| DOJ | Department of Justice |
| ESEC | External Liaison Team |
| FOIA | Freedom of Information Act |
| OCIO | Office of Chief Information Officer |
| OGC | Office of General Counsel |
| OIG | Office of Inspector General |
| OLA | Office of Legislative Affairs |
| PSI | Permanent Subcommittee on Investigations |
| SOP | Standard Operating Procedure |
| U.S.C. | United States Codes |

## Introduction

The *Freedom of Information Act* (FOIA)[1] and congressional oversight serve to promote transparency in, and facilitate oversight of, the Federal Government. Agency responses to these requests provide the public with important information about their government and play a vital role in our democracy. As the third largest Federal department, composed of 22 components with various law enforcement and national security missions, the Department of Homeland Security and its operations are the subject of intense public and congressional interest. DHS receives the most FOIA requests of any Federal agency,[2] and some 86 congressional committees and subcommittees have asserted some form of jurisdiction or oversight of it.[3] As a result, DHS must ensure it has processes in place to respond to these requests in a timely and efficient manner, in compliance with laws, regulations, and internal policies.

In response to a request from the Senate Homeland Security and Governmental Affairs Committee, Permanent Subcommittee on Investigations, we conducted a review of DHS' handling of FOIA requests and congressional requests directed to the DHS Office of the Secretary — specifically, the DHS Secretary and Deputy Secretary.[4]

## Background

The DHS Privacy Office handles FOIA requests directed to the DHS Secretary and Deputy Secretary; requests directed to the DHS Secretary and Deputy Secretary by Members of Congress and congressional committees are handled by the Office of the Executive Secretary, Communications and Operations, External Liaison Team, as shown in figure 1.

[1] 5 United States Code (U.S.C.) § 552 (2006 & Supp. IV 2010)
[2] Department of Justice Summary of Annual FOIA Reports for Fiscal Year 2019 states that DHS received 47 percent of all FOIA requests to the Federal government, nearly 200,000 more than the Federal agency that received the second most requests.
[3] On September 4, 2007, then DHS Secretary Michael Chertoff sent a letter to U.S. Representative Peter King providing a list of 86 committees and subcommittees that claim jurisdiction over DHS.
[4] Our review did not include requests sent directly to DHS components.

**Figure 1: Simplified DHS Office of the Secretary Organizational Chart**




*Source*: Office of Inspector General (OIG) based on DHS organizational charts

### Requests for Information under FOIA

Congress enacted FOIA to give the public access to information in the Federal Government. The Supreme Court has explained that "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."[5] In furtherance of this purpose, the Act requires Federal executive branch agencies, such as DHS and its components, to respond to a request within 20 business days, and to disclose responsive records unless such records are protected from disclosure by one or more enumerated exemptions.[6]

If an agency fails to respond to a request within the allotted time, the requester may file a lawsuit in Federal court. If a requester is unsatisfied with the agency's initial response to the request, the requester must first file an appeal with the agency before seeking relief in Federal court. At DHS, if a requester appeals the initial response, the matter is referred to an Administrative Law

---

[5] *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978)
[6] 5 U.S.C. § 552(b). Appendix C provides information on the nine FOIA exemptions.

Judge (ALJ) from the United States Coast Guard, who adjudicates all such appeals by conducting an independent review of the request and response and issuing a decision to the requester.[7] FOIA requires decisions on appeals be issued within 20 business days.[8] If the appeal is not favorable to the requester, or takes longer than 20 business days to decide,[9] the requester may file a lawsuit in Federal court.[10]

At DHS, the FOIA Operations and Management Team (FOIA Team) within the Privacy Office processes FOIA requests submitted to the Privacy Office and 14 other DHS Headquarters offices.[11] To process and respond to requests, the FOIA Team takes the steps detailed in appendix D. The FOIA Team is also responsible for providing regulatory and policy guidance to DHS on compliance with FOIA.[12] Generally, the FOIA Team's guidance reiterates Department of Justice (DOJ) Office of Information Policy's guidance and information from the FOIA.gov website.

**Requests for Information from Congress**

Congress enjoys broad authority to obtain information. Although there is no express provision of the Constitution or specific statute authorizing the conduct of congressional oversight or investigations, the Supreme Court has established that such power is essential to the legislative function.[13]

---

[7] The ALJ's independent review includes review of the entire administrative file before the agency at the time of the determination, including (if applicable) any correspondence between the agency and the requester (e.g., narrowing the scope of the request), the search conducted by the agency, the search results, the FOIA exemptions applied by the agency, and the final agency response.
[8] 5 U.S.C. § 552(a)(6)(A)(ii)
[9] 5 U.S.C. § 552(a)(6)(A)
[10] 5 U.S.C. § 552(a)(4)(B)
[11] The 14 other DHS Headquarters offices are: Countering Weapons of Mass Destruction Office; Management Directorate; Military Advisor's Office; Office for Civil Rights and Civil Liberties; Office of Health Affairs; Office of Legislative Affairs; Office of Operations Coordination; Office of Partnership and Engagement; Office of Public Affairs; Office of Strategy, Policy, and Plans; Office of the Citizenship and Immigration Services Ombudsman; Office of the Executive Secretary; Office of the General Counsel; and Office of the Secretary.
[12] DHS Policy Directive 262-11: *Freedom of Information Act Compliance*
[13] *Watkins v. United States*, 354 U.S. 178, 187 (1957) (emphasizing the "…power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes."); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 (1975) (stating the scope of Congress' power of inquiry is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution).

Within DHS, the External Liaison Team (ESEC)[14] in the Office of the Executive Secretary's Communications and Operations group manages external correspondence addressed to the Secretary and Deputy Secretary, including congressional correspondence. The Office of Legislative Affairs (OLA) receives the congressional correspondence and sends it to ESEC to coordinate the response. If the response involves information from one or more DHS components, ESEC tasks the appropriate component(s) for a response. The component drafts the response, acquires all necessary internal clearances,[15] and sends the response back to ESEC to coordinate clearance within DHS.[16]

Once the component or ESEC has prepared a response, ESEC acquires clearances with DHS' Office of Management, Office of Policy,[17] OLA, and Office of General Counsel (OGC). ESEC then packages the response for signature. ESEC's internal policy provides 5 to 15 business days to respond to congressional requests, depending on whether a request is deemed "urgent" or "routine." If a component head is to provide the response, the component releases the cleared response to Congress. If the Secretary or Deputy Secretary is to provide the response, DHS OLA releases the cleared response to Congress. Appendix D includes a flowchart showing this process.

## Results of Review

While DHS generally met statutory deadlines for responding to simple FOIA requests, it did not do so for most complex requests.[18] The FOIA Team experienced significant increases in the number of requests received but FOIA Team managers said they have limited staff to handle the volume, making it difficult to meet the 20-business-day requirement. In addition, the FOIA Team processed requests for 14 other DHS Headquarters offices, but did not track and could not easily identify the number of requests it processes for each office

[14] We use "ESEC" to refer to the External Liaison Team for the purposes of this report.
[15] Clearance is the process by which relevant staff and senior leadership reviews and concurs with materials intended for release.
[16] In comments to our draft report, DHS stated that ESEC receives congressional correspondence through several sources, such as DHS components or external stakeholders, and via other means, such as email or United States Postal Service, not just through OLA. In addition, DHS clarified that the component, not ESEC, coordinates clearance with DHS' Office of Management, Office of Strategy, Policy, and Plans, Office of Legislative Affairs (OLA), and General Counsel (OGC) prior to sending the response back to ESEC. Because these changes appear to post-date our fieldwork, we are unable to independently verify them.
[17] The Office of Policy has since been renamed the Office of Strategy, Policy, and Plans.
[18] A simple request is a FOIA request that an agency anticipates will involve a small volume of material or can be processed relatively quickly. A complex request typically seeks a high volume of material or requires additional steps to process, such as the need to search for records in multiple locations. *See* https://www.foia.gov/glossary.html.

so it could seek reimbursement. The FOIA Team also did not have sufficient electronic storage space to receive and process all responsive documents, which delayed several FOIA responses, in many cases by more than a year. Additionally, although reliant on DHS components and the Office of Chief Information Officer (OCIO) to conduct searches and document the methods used to complete those searches, the FOIA Team did not consistently receive completed search forms to indicate a reasonable search was conducted. However, despite the limitations and as set forth below, DHS FOIA response times are better than the averages across the Federal Government.

When responding to congressional requests, we found DHS often exceeded its timeliness goals and did not consistently provide interim responses. Further, DHS redacted personal information in its responses to congressional committee chairs that was eligible for release under DHS policy.

## Resource Constraints Have Limited DHS' Ability to Respond to FOIA Requests Timely

Past and current resource limitations have delayed DHS responses to FOIA requests. The FOIA Team has faced challenges in timely processing due to a sharp increase in requests in fiscal years 2017 and 2018, and limited staff to handle the number of requests they receive. The FOIA Team also processes requests for 14 other DHS Headquarters offices, which increases the workload. However, the FOIA Team does not track and cannot easily identify the number of FOIA requests it processes for each office. As a result, it does not exercise its ability to seek reimbursement from the offices for the services it provides. We also found several FOIA responses had been delayed, in many cases by more than a year, because the FOIA Team did not have sufficient electronic storage space to accommodate the responsive emails.

### Limited Staffing and Increases in FOIA Requests Hindered the FOIA Team's Ability to Meet Statutory Response Timeframes

According to FOIA, an agency must release records within 20 business days; however, with written notice to the requester, an agency may automatically extend the timeframe by an additional 10 business days for complex requests requiring the agency to:

- search for and collect requested records held by an office different than the one processing the request;
- examine a voluminous amount of records; or

- consult with other agencies with a substantial interest in the determination of the request.[19]

Even with the 10-day extension, the DHS FOIA Team consistently did not meet the statutory response time for complex requests for FYs 2013 to 2018. The FOIA Team took an average of 85 days to process complex requests during this period, peaking at an average of 99 days in FY 2018. Nevertheless, the DHS FOIA Team's processing averages have been consistently lower than the averages across the Federal Government (figure 2).

**Figure 2: Average Business Days for FOIA Team to Respond to FOIA Requests Compared to Federal-wide*, FYs 2013–2018**




*Source*: OIG analysis of FOIA.gov data
* DOJ, *Summary of Annual FOIA Reports for Fiscal Year 2016.* DOJ did not report the average number of days for complex requests in its FY 2017 or FY 2018 reports, and we could not calculate it based on available data.

When Federal agencies do not respond to FOIA requests within statutory timeframes, a requester may file suit against the agency. We reviewed all 62 litigation cases the FOIA Team had from October 2014 to May 2018[20] and determined in the majority of cases, 49 of 62 FOIA requesters (79 percent) alleged lack of timeliness as the reason for litigation.[21] These requesters waited 23 to 478 business days from when they submitted the initial FOIA request to when they filed the litigation. The reasons for litigation in the remaining 13

[19] 5 U.S.C. § 552(a)(6)(B)
[20] The FOIA Team tracks litigation cases against its office and the 14 DHS Headquarters offices for which it processes FOIA requests.
[21] See appendix E for all 62 litigated cases.

cases included challenges to the adequacy of the searches performed, application of exemptions, and failure to approve expedited processing.

According to FOIA Team managers, they do not have enough staff to handle the number of FOIA requests they receive, which increased 125 percent in FY 2017, resulting in difficulty meeting the 20-business-day requirement. FOIA Team managers have requested additional staff, but the FOIA Team does not have its own line item in DHS' budget; rather, they receive funds from the Privacy Office. According to the Deputy Chief FOIA Officer, since FY 2017, he has been able to hire contractors with funds available from the attrition of Federal employees and funds received from components for their use of FOIAXpress, the system used by DHS to track FOIA requests. Despite these efforts, the total number of staff has not increased at a rate commensurate with the increase in FOIA requests received, as shown in table 1.

**Table 1: Total FOIA Requests Received and Total Full-Time and Full-Time Equivalent FOIA Staff, FYs 2013–2018**

| Fiscal Year | Number of FOIA Requests Received | Full-Time and Full-Time Equivalent FOIA Staff |
|---|---|---|
| **2013** | 798 | 16 |
| **2014** | 705 | 17 |
| **2015** | 649 | 18.6 |
| **2016** | 599 | 16.58 |
| **2017** | 1,348 | 19.25 |
| **2018** | 1,448 | 25 |

*Source*: OIG analysis of FOIA.gov data

Based on this data, between FYs 2013 and 2016, the average ratio of FOIA staff members to FOIA requests was approximately 1:40; for FYs 2017 and 2018, that ratio was 1:64.

### The FOIA Team Did Not Track and Seek Reimbursement for Work Performed on Behalf of 14 Other DHS Headquarters Offices

In addition to processing FOIA requests the Privacy Office receives, the FOIA Team also processes requests for 14 other DHS Headquarters offices. The FOIA Team is authorized to receive reimbursement for this work from the other offices, but does not do so, in part because it does not track and cannot easily identify the number of FOIA requests it processes for each office.

According to Office of Management and Budget, Circular A-11, *Preparation, Submission, and Execution of the Budget*, agencies can perform reimbursable

work for other agencies under the Economy Act.[22] The Economy Act authorizes the head of a major organizational unit to place an order with another major organizational unit within the same agency for services.[23] The service-providing unit — the FOIA Team, in this case — can charge the ordering units — the 14 DHS Headquarters offices — the actual cost of the services provided.

To receive reimbursement for the FOIA requests it processes for the 14 other DHS Headquarters offices, the FOIA Team would need to identify the costs associated with processing the requests. However, the FOIA Team does not track requests processed for the individual offices, and instead categorizes all requests it processes as a "Privacy Office" request in FOIAXpress. As a result, to identify the specific DHS Headquarters office for which a particular request was processed, the FOIA Team needs to open each Privacy Office request individually, which is labor intensive and inefficient. Consequently, the FOIA Team does not calculate the cost of the services it provides to each office and has not sought the reimbursement it might otherwise collect to address some of its resource limitations.[24]

### DHS Did Not Allot Sufficient Electronic Storage Space to Handle Its FOIA Processing Needs

FOIA states that in responding to a request for records, "[a]n agency shall make reasonable efforts to search for the records in electronic form or format…."[25] The DHS FOIA Team relies on OCIO to search for and collect emails responsive to FOIA requests.[26] Although OCIO completes these searches, in the past the FOIA Team lacked the necessary electronic storage space to receive all responses, which delayed the processing of these FOIA requests.

Until September 2018, when OCIO completed a search in response to a FOIA request, it informed the FOIA Team of the aggregate file size of the collected responsive emails, at which point the FOIA Team would determine whether it had the storage capacity on its server to receive the responsive emails. In

[22] Office of Management and Budget Circular A-11, *Preparation, Submission, and Execution of the Budget*, 20.12, June 2019
[23] 31 U.S.C. § 1535
[24] Although providing no monetary reimbursement, two offices have assigned a staff member each to assist in processing FOIA requests and alleviate some of the FOIA Team's workload.
[25] 5 U.S.C. § 552(a)(3)(C)
[26] DHS Policy Directive 141-01, *Records and Information Management*, (August 11, 2014) established the policy for managing such records, requiring OCIO "…provide for the seamless capture and storage of electronic records and associated metadata in DHS enterprise–wide systems and applications."

September 2018, however, the FOIA Team reached capacity on its server[27] and could not take additional responsive emails from OCIO, including eight pending transfers as shown in table 2, until the FOIA Team created additional space by expanding its server capacity or deleting records already provided to requesters. Because the FOIA Team did not have sufficient electronic storage space to receive the responsive emails, the emails stayed in OCIO instead of being processed and produced to the FOIA requester. As the data in table 2 shows, without adequate server capacity to receive responsive emails from OCIO, the FOIA Team exceeded statutory deadlines in many instances by more than 200 business days.

**Table 2: Pending Transfers from OCIO, as of September 25, 2018**

| Date of Request | Size of File | Elapsed Business Days |
|---|---|---|
| June 23, 2017 | 40 GB | 316 |
| June 29, 2017 | 36 GB | 312 |
| July 5, 2017 | 48 GB | 309 |
| July 19, 2017 | 64 GB | 299 |
| September 5, 2017 | 7 GB | 266 |
| October 13, 2017 | 25.4 GB | 239 |
| December 4, 2017 | 44 GB | 205 |
| January 31, 2018 | 37.3 GB | 166 |

*Source*: OIG analysis of OCIO data and discussions with FOIA Team personnel

Despite the absence of adequate server space, the FOIA Team took some steps to try to make progress on these FOIA requests. For instance, in one case, the FOIA Team worked with the requester and OCIO over several months to narrow the scope of the request until the volume of responsive emails was small enough to fit on the FOIA Team's server.

As of August 2019, the FOIA Team upgraded its servers and was able to add additional electronic storage space. According to a Privacy Office official, the FOIA Team is no longer having issues accepting responsive emails from OCIO. The Deputy Chief FOIA Officer said there are plans to move the FOIA Team's server to a cloud-based system by March 2020, which would further mitigate the storage capacity issue.

[27] The FOIA Team's server capacity was six terabytes (TB) as of September 25, 2018. One TB is equal to 1,000 gigabytes (GB). The FOIA Team updated the server capacity to 10.5 TB as of August 8, 2019.

## Components and OCIO Did Not Consistently Complete FOIA Search Forms to Indicate They Conducted a Reasonable Search

When responding to a FOIA request, a Federal agency must conduct a reasonable search for responsive documents.[28] DOJ's *Guide to the Freedom of Information Act – Procedural Requirements* specifies:

> As a general rule, courts require agencies to undertake a search that is 'reasonably calculated to uncover all relevant documents.' … the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.[29]

Appeals filed by requesters often cite concerns with the reasonableness of an agency's search. Documenting the search methods used to identify and collect documents responsive to a FOIA request provides the agency with critical information needed to establish the reasonableness of the search.

Because the FOIA Team lacks access to all DHS systems and the knowledge needed to run comprehensive searches within these systems, it must rely on DHS components and OCIO to conduct searches and document the methods used. According to the FOIA Team's draft SOP, the FOIA Team provides a search form to be completed and returned when it tasks DHS components and OCIO to search for relevant records. The form sent to the components requests information about how the search was conducted, including the locations searched (e.g., paper files, electronic databases, desktop computers, shared drives, and thumb drives), search terms used, time spent searching, whether any records were found, and if the component recommends withholding information. The form sent to OCIO specifies what key words, email accounts, and relevant date ranges to search.

The Director of Compliance and Oversight said that, even when components send back responsive documents, they do not always return a completed form detailing their search methods. Additionally, OCIO sends the FOIA Team an email stating whether it found responsive emails and the size of the data set rather than returning the search form, which specifies key words, email accounts, and date ranges searched. We analyzed six FOIA requests tasked to

---

[28] *Valencia-Lucena v. United States Coast Guard, FOIA/PA Records Mgmt.*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citations omitted). See also *Ancient Coin Collectors Guild v. United States Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) ("An agency is required to perform more than a perfunctory search in response to a FOIA request.")
[29] DOJ, *Guide to the Freedom of Information Act – Procedural Requirements*, October 12, 2018 (internal quotations and citations omitted)

DHS components, and three to OCIO. Of these nine FOIA requests, only three (by a DHS component) returned a completed search form. In three cases, the FOIA Team did not provide the search form when tasking the FOIA request to the component or OCIO.

Additionally, the FOIA Team's previous search form required the searcher to certify he or she had conducted a reasonable search, but the current iteration of the form does not require this certification. Since dispensing with this requirement, neither component nor OCIO staff provide contemporaneous certification of the reasonableness of their search.

At least half of the 60 appeal cases we reviewed challenged the adequacy of DHS' search. The returned search forms can be important evidence to show DHS conducted a reasonable search. In fact, DHS has used completed search forms and accompanying certification statements as evidence in appeals and litigation to prove its use of appropriate methods to search for responsive documents. Without this evidence, DHS may be placed at a disadvantage in such litigation.

## DHS Often Exceeded Its Timeliness Goal When Responding to Congressional Requests and Redacted Information Eligible for Release under DHS Policy

In addition to reviewing how DHS responds to FOIA requests, we sought to determine how DHS responds to congressional requests. Unlike FOIA, DHS does not have legal requirements dictating a particular process to follow when responding to congressional requests; rather, DHS has developed and relies on internal standard operating procedures (SOP) and guidance. We found DHS exceeded its own timeliness goal for responding to congressional requests 49 percent of the time, sometimes by more than 450 business days. In some instances when DHS exceeded its timeliness goal, it did not provide any form of interim response. We also found DHS redacted personal information from responses to congressional committee chairs that was eligible for release under DHS policy.

### DHS Took an Average of Almost 27 Business Days to Respond to Congressional Requests

The DHS ESEC *Executive Correspondence Handbook* specifies policies and procedures for all DHS correspondence, including correspondence with Congress, and stresses: "In support of the Secretary's commitment to being responsive, the Department-wide standard is to transmit a timely response."

ESEC's timeliness goal ranges from providing a response within 5 and 15 business days.

To determine whether DHS Headquarters is providing substantive responses to congressional requests — i.e., beyond merely confirming receipt of correspondence or providing non-substantive interim responses — consistent with its own time goal, we analyzed data on all 2,894 congressional letters received from October 2014 to June 2018. DHS had issued a final response to 2,832 of those letters (closed letters); 62 letters remained open. We analyzed the closed letters and determined ESEC did not meet its response time goal of 15 or fewer business days 49 percent of the time (1,383 of 2,832 closed letters), as shown in figure 3. On average, ESEC took almost 27 business days in that period to close a congressional letter, with some responses going out within 1 business day, while at least one response took longer than 450 business days to issue.

**Figure 3: Timeliness of DHS Closing Congressional Letters in Business Days, October 2014 to June 2018**




*Source*: OIG analysis of ESEC data

According to the ESEC *Executive Correspondence Handbook*, if components expect to exceed the timeliness goal when preparing and clearing a response to a congressional request, components should periodically provide an interim response. Our analysis of 30 congressional letters older than 60 business days indicated 12 did not receive an interim letter. Seven of the 12 requests did not receive any update — whether orally or in writing — regarding the status of the request, meaning 7 requesters heard nothing from DHS for at least 60 days after sending a request. ESEC staff said components do not need to provide an

interim response, but the *Executive Correspondence Handbook* suggests doing so and includes an interim response template as an appendix.

ESEC and component staff told us the scope of the congressional request, the volume of documents requested, and the review process affect how quickly they can respond. Depending on the information requested, DHS seeks clearance from DHS' Office of Management, Office of Strategy, Policy, and Plans, OLA, OGC, its components, and outside agencies before release. Additionally, requests for alien files can take longer to process because they contain personal information and can include sensitive case information, which involve clearance from multiple DHS components and, in some cases, DOJ.[30] For example, DHS received a request from a congressional subcommittee for the alien files for five individuals.[31] Roughly 3 months later, OLA informed a subcommittee staff member the files had been reviewed by DHS, but were with DOJ for its review. DHS ultimately provided the files, with redactions, to the subcommittee 5 months after receiving the initial request.

**DHS Redacted Information in Response to Requests from Congressional Committee Chairs Although It Was Eligible for Release under DHS Policy**

DHS may withhold or redact information requested by Congress based on a variety of constitutional principles, common law privileges, and statutory exemptions.[32] We did not review the legal sufficiency of DHS' justifications in withholding or redacting information requested by Congress, though we did examine whether withholdings or redactions were done in accordance with DHS' own policies.

The OLA SOP states personally identifiable information "can be provided following a written request from a committee or subcommittee chairman." Further, the ESEC *Executive Correspondence Handbook*, includes a call-out text box stating,

> Privacy releases are required to release an individual's personal information to a third party — unless the Chairperson of a congressional committee is requesting the information in their official capacity.

---

[30] If an alien is under investigation by the Federal Bureau of Investigation, then DOJ will have to clear the file as well.
[31] An alien file contains personal information on non-U.S. citizens, including name, date of birth, place of birth, photographs, application information, affidavits, correspondence, and more, and can be hundreds of pages.
[32] Other limitations include Executive privilege, the Privacy Act, pending litigation, and classified and sensitive materials.

Despite the guidance allowing release to congressional committee chairs, we found DHS redacted personal information in materials (e.g., personnel and case files) responsive to requests made by committee chairs in their official capacity. We analyzed 30 such letters older than 60 business days and found DHS issued a response to 28 of the 30 letters.[33] Of those 28 responses, 6 included some redacted information appearing to be personal information that was eligible for release per DHS' guidance. DHS did not provide the basis for withholding in any of the six responses to the committee chairpersons.

The OGC staff we interviewed stated congressional committees are not allowed to receive "any and all" documents unredacted, and DHS redacts information even if it is going to a chairperson. OGC staff also told us DHS does not provide reasons for redactions in the response unless asked, stating it would "take too long." Further, component staff we spoke to said they never send unredacted alien files or provide reasons for redactions. When withholding is not required by law and disclosure is permitted under DHS' own guidance, the absence of explanation regarding particular redactions can create confusion about the basis for, and legitimacy of, the redactions.

## Conclusion

DHS has a responsibility to respond to FOIA and congressional requests consistent with laws, regulations, and internal policies. Our review found DHS struggles in the execution of that responsibility. Specifically, DHS has had difficulty meeting FOIA production timelines and does not fully document its FOIA search efforts, resulting in litigation risk. Similarly, DHS has struggled to respond to congressional requests in accordance with internal timeliness goals, meeting its response time goal slightly more than half of the time, with some requests going unanswered for more than a year. To promote transparency and facilitate oversight, DHS must ensure it has processes in place to respond to these requests in a timely and efficient manner.

## OIG Analysis of Management Comments

We included a copy of DHS' management comments in their entirety in appendix B. We also received technical comments and incorporated them in the report where appropriate. A summary of DHS's response and our analysis follows.

[33] We analyzed a judgmental sample (30 out of 2,896) of congressional letters.

In its response, DHS management noted that it holds a large volume of records, including immigration records and DHS policies, which are of great interest to the general public, the news media, and Congress. DHS management explained that its FOIA backlog continues to be a systematic problem for DHS but initiated its "DHS 2020 - 2023 FOIA Backlog Reduction Plan" in March 2020 to reduce the backlog. DHS management asserted that this report did not take into account certain complicating factors that can impact DHS' response to a congressional inquiry, including the report's discussion of interim responses and applying redactions.

We appreciate the efforts DHS made in providing their technical comments. We modified the report accordingly where appropriate. Specifically, we updated flowcharts and made minor revisions to the report to enhance clarity and ensure accuracy. We commend DHS for proactively creating its FOIA backlog reduction plan in March 2020 to address an issue we identified in the report. We also appreciate DHS' comments regarding its responses to congressional inquiries and acknowledge DHS' assertion that complicated factors are involved in providing responses to congressional requests. However, as outlined in appendix A, OIG gathered the information it relied upon for this report through interviews with key personnel, DHS policies and procedures provided by the DHS offices subject to this review, and a review of the underlying data for FOIA and congressional responses. OIG attests to the accuracy of this report in conformity with the values of the independence of this office.

## Appendix A
## Objective, Scope, and Methodology

Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*.

We conducted this inspection in response to a congressional request from the Senate Homeland Security and Governmental Affairs Committee, Permanent Subcommittee on Investigations to determine how DHS Headquarters is responding (1) to FOIA requests and (2) to congressional requests.

To determine whether the FOIA Team within DHS Headquarters is complying with Federal requirements when responding to FOIA requests, we obtained an extract of all FOIA requests from October 2014 to May 2018. Of these, we obtained samples of (1) search forms used for initial FOIA requests and analyzed the completeness of the forms; (2) FOIA cases that were subject to appeal and analyzed the adequacy of the response; and (3) all FOIA litigated cases to determine the reasons for litigation. We also analyzed data available on FOIA.gov. Further, we reviewed DHS and component policies and procedures for responding to FOIA requests.

We interviewed personnel from the FOIA Team, including the Deputy Chief FOIA Officer, directors, and processors on the FOIA Team. We interviewed component FOIA directors from the United States Secret Service, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, the Federal Emergency Management Agency, the Transportation Security Administration, and the Office of Civil Rights and Civil Liberties. We also interviewed the Data Acquisition Manager at OCIO responsible for searching for responsive emails.

To determine whether ESEC is responding to congressional requests we obtained a sample of all congressional letters from October 2014 to May 2018. We analyzed what was requested, how long it took DHS to respond, if DHS provided an interim response, and what responsive documents DHS provided. Further, we reviewed DHS and component policies and procedures for responding to congressional requests.

We interviewed DHS Headquarters and component staff responsible for overseeing and responding to congressional requests. Specifically, we interviewed personnel at DHS ESEC, OLA, and OGC. We also interviewed component personnel responsible for responding to congressional requests at

U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and the U.S. Citizenship and Immigration Services.

We conducted fieldwork for this review between May and November 2018 pursuant to the authority of the *Inspector General Act of 1978*, as amended. This report was prepared according to the *Quality Standards for Federal Offices of Inspector General* issued by the Council of the Inspectors General on Integrity and Efficiency.

# Appendix B
# DHS Comments to the Draft Report

U.S. Department of Homeland Security
Washington, DC 20528

Homeland Security

May 18, 2020

MEMORANDUM FOR: Joseph V. Cuffari, Ph.D.
Inspector General

FROM: Jim H. Crumpacker, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

JIM H CRUMPACKER Digitally signed by JIM H CRUMPACKER Date: 2020.05.18 15:03:04 -04'00'

SUBJECT: Management Response to Draft Report: "DHS' Process for Responding to FOIA and Congressional Requests" (Project No. 18-085-ISP-PRIV)

Thank you for the opportunity to comment on the draft report. The U.S. Department of Homeland Security's (DHS or the Department) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

The Department is pleased to note OIG's positive recognition of U.S. Department of Justice reporting highlighting that the DHS Freedom of Information Act (FOIA) Program processing averages for both simple and complex requests have for years been consistently lower than the averages across the Federal Government. The Program provides the public and DHS with an immensely valuable service, providing records that promote transparency and directly impact and assist the public while also protecting sensitive, confidential, and private information.

Senior DHS leadership, however, is concerned that OIG's draft report contained several significant factual and contextual problems regarding DHS' handling of FOIA and congressional requests. For example, review of the report disclosed several apparent misunderstandings about what the FOIA requires. In addition, the flowcharts in the report depicting the "DHS Privacy Office FOIA Request Process" and the "DHS Congressional Request Process" were inaccurate.

Departmental program officials and subject matter experts provided the OIG technical comments under a separate cover to address these and other concerns and, to OIG's credit, the team conducting this review provided some feedback on how it planned to adjudicate these comments. It is not entirely clear, however, whether the concerns were

adequately addressed because the team was unwilling to share a revised copy of its draft report with DHS prior to final report publication.

**DHS Freedom of Information Act Program**

While the primary purpose of FOIA is to shed light on the government's actions, the law is also used by people who are applying for immigration or other benefits, researching family history, seeking business information about competitors' contacts with the agency, and other purposes. The majority of FOIA requests DHS receives are for first-party records, meaning that requesters are seeking copies of information about themselves previously submitted to the government or records that document their interactions with agency officials. DHS receives a substantial number of first-party requests for contents of Alien files (A-Files) held by the U.S. Citizenship and Immigration Services (USCIS), entry-exit records held by U.S. Customs and Border Protection, biometric information held by the DHS Office of Biometric Identity Management, and personnel records held throughout the Department. DHS also receives third-party requests for these kinds of records related to high-profile people, particularly once the person is deceased.

Requests for A-file material comprise the vast majority of DHS's FOIA workload and are typically very time-consuming to fully process. A-Files document the interactions of immigrants with the U.S. government and other events while such individuals were entering or residing in the United States. The average A-File includes around 200 pages, but the size of A-Files is increasing and varies significantly based on the number of interactions with U.S. officials and the amount of material submitted to the government by the individual. These records are largely paper-based and are held and processed at the National Records Center facility in Lee Summit, Missouri, which encompasses an area of nearly six football fields and stores more than 20 million immigration files. A-Files might also be located at one of hundreds of USCIS field offices around the country and government offices overseas. To process a FOIA request for A-file material, USCIS must locate and retrieve the file and digitize its contents before the documents can be reviewed.

DHS also holds records that are of regular interest both to first parties and members of the news media. This category includes U.S. Immigrations and Customs Enforcement (ICE), Homeland Security Investigations (HSI) records, the results of U.S. Coast Guard accident investigations, and records generated by the Federal Emergency Management Agency related to disaster recovery. Additionally, the Department produces other records that are regularly requested by the news media, academia, civil society organizations, and businesses. Commonly requested records in this category include Congressional correspondence and contracts. There is also a great deal of interest in DHS policies, including policies related to ICE HSI, and in DHS's efforts to implement high-profile Administration priorities, such as the construction of a wall on the southern border.

While FOIA backlogs have continued to be a systemic problem at DHS, the Department has made impressive progress on the number of requests processed each year. These gains, however, have been surpassed by steady increases in the number of incoming requests. The backlog has also been influenced by an increase in the complexity of requests and the volume of electronic records generated by the Department. The "DHS 2020 - 2023 FOIA Backlog Reduction Plan," dated March 2020, includes five goals that lay out a sustainable course for containing and reducing the age of the backlog in the short-term, and sustainably lowering the size of the backlog over the next three to five years. To achieve success, the plan addresses the underlying causes of the backlog – including decentralization, technology and interoperability limitations, and staffing and resource constraints. The Department's FOIA vision is to embrace modern workforce and information management techniques, leverage technology, enhance our systems and rebuild our processes to create a modern, mature, and sustainable FOIA program. The plan is available on the DHS public facing website at: https://www.dhs.gov/sites/default/files/publications/final_dhs_backlog_reduction_plan_2020-2023_3.6.20.pdf.

**DHS Handling of Congressional Requests**

Congressional inquiries to the Department range from matters related to routine constituent correspondence submitted by individual Members of Congress to all-encompassing oversight requests received from congressional committee Chairman and Ranking Members. The process and effort required to effectively satisfy these inquiries varies greatly. Unfortunately, the OIG's draft report does not take this variation into account, thus likely leaving many "cold readers" of the report with a mistaken impression that every congressional inquiry is basically handled the same, which is not true.

Complicating factors that can adversely affect that level of effort and time needed to respond to congressional inquiries can include whether an inquiry concerns pending policy decisions, litigation, or a current event(s) at the forefront of high priority and rapidly evolving issues. DHS also does not believe that OIG's draft report fully discussed all the nuanced considerations associated with providing interim responses to congressional requests. Regardless of the circumstances, staff in the Department's Office of the Executive Secretariat, which is responsible for processing congressional inquiries, prioritizes each inquiry and works with the Department's Components and Headquarters Offices, as appropriate, to ensure each is responded to accurately, completely, and in a reasonably timely manner.

Senior DHS leadership is also concerned about the OIG opining on whether certain redactions were necessary and whether certain accommodations were made when responding to congressional requests. The OIG's draft report correctly states that DHS and the Executive Branch are subject to legitimate congressional oversight in pursuit of

Congress' legislative function. However, the report does not fully explain that when responding to congressional oversight inquiries, the Department is governed, in part, by the concept of accomodation between the political branches. Through accommodation, the Legislative Branch articulates the specific legislative purpose and limited scope of its request, and Executive Branch facilitates the production of information. That production could be in the form of testimony, briefings, site-visits, written responses, and select documentation. When providing documents for congressional review, DHS will, as the nature of the information and the document require, withhold documents or redact certain material from documents when such document or information would be outside the scope of the request, is privileged, or otherwise inappropriate to disclose.

While OIG's draft report acknowledges that it "did not review for legal sufficiency DHS's justifications in withholding or redaction information," the report nevertheless states that the Department "could have released more information." It bases this assertion on internal DHS Office of Legislative Affairs (OLA) guidance related to the protection of Personally Identifiable Information pursuant to the Privacy Act (5 U.S.C. § 552a(b)(9)). In so stating, the report conflates procedural measures OLA follows to ensure compliance with the Privacy Act *with* the Department's obligations under the legislative oversight responsibilities and the accommodations process, which governs such interactions between Article I and Article II. Often, the name of an individual—especially a non-decision-making individual—is not essential to the Committee's legislative or oversight purpose. This means that the disclosure of that name, while might be *permissible* under the Privacy Act, is not *required* and, in fact, could have adverse consequences for both the employee and the Department. In those instances, that individual's name is not released.

More fundamentally, however, the OIG ordinarily is not privy to the negotiations and ongoing accommodations concerning any particular request and is therefore unable to speak as to the substance of the redactions made or not made. Indeed, the draft report freely recognizes this stating, "DHS may withhold or redact information requested by Congress based on a variety of Constitutional principles, common law privileges, and statutory exemptions. We did not review the legal sufficiency of DHS' justifications in withholding or redacting information requested by Congress." Because the OIG may not have the full background on the purpose or scope of Congressional requests to which DHS responds, it is unfounded for it to assert that redactions were improper simply because they were not prohibited by the Privacy Act.

* * *

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions or concerns.

## Appendix C
## Information Exempt from Disclosure under FOIA

| Exemption Number | Matters that are exempt from FOIA |
|---|---|
| (1) | (A) Specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to the Executive Order. |
| (2) | Related solely to the internal personnel rules and practices of an agency. |
| (3) | Specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute:<br>(A) requires that matters be withheld from the public in such a manner as to leave no discretion on the issue, or<br>(B) establishes particular criteria for withholding or refers to particular types of matters to be withheld, and<br>(C) if enacted after October 28, 2009, specifically refers to section 552(b)(3) of Title 5, United States Code. |
| (4) | Trade secrets and commercial or financial information obtained from a person and privileged or confidential. |
| (5) | Interagency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency. |
| (6) | Personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. |
| (7) | Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information: |
| (A) | could reasonably be expected to interfere with enforcement proceedings; |
| (B) | would deprive a person of a right to a fair trial or impartial adjudication; |
| (C) | could reasonably be expected to constitute an unwarranted invasion of personal privacy; |
| (D) | could reasonably be expected to disclose the identity of a confidential source, including a state, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by confidential source; |
| (E) | would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or |
| (F) | could reasonably be expected to endanger the life or physical safety of an individual. |
| (8) | Contained in or related to examination, operating, or condition of reports prepared by, on behalf of, or for the use of an agency responsible for the regulation of supervision of financial institutions. |
| (9) | Geological and geophysical information and data, including maps, concerning wells. |

*Source*: 5 U.S.C. § 552(b)(1) through (b)(9)

# Appendix D
# DHS Privacy Office FOIA Request Process and DHS Congressional Request Process

## DHS Privacy Office FOIA Request Process




*Source*: OIG analysis of FOIA Team documents

## DHS Congressional Request Process




*Source*: OIG analysis of ESEC and OLA documents

## Appendix E
## FOIA Litigated Cases

| Cases | Elapsed Business Days* | Reason for Litigation |
|---|---|---|
| 1 | 9 | Failure to approve expedited processing |
| 2 | 23 | Timeliness |
| 3 | 23 | Timeliness |
| 4 | 25 | Timeliness |
| 5 | 32 | Timeliness |
| 6 | 40 | Timeliness |
| 7 | 40 | Inadequate Search |
| 8 | 41 | Timeliness |
| 9 | 41 | Timeliness |
| 10 | 41 | Timeliness |
| 11 | 42 | Timeliness |
| 12 | 42 | Timeliness |
| 13 | 42 | Timeliness |
| 14 | 43 | Timeliness |
| 15 | 48 | Timeliness |
| 16 | 49 | Timeliness |
| 17 | 53 | Timeliness |
| 18 | 54 | Inadequate Search |
| 19 | 57 | Timeliness |
| 20 | 57 | Timeliness |
| 21 | 63 | Timeliness |
| 22 | 64 | Timeliness |
| 23 | 65 | Timeliness |
| 24 | 67 | Timeliness |
| 25 | 71 | Timeliness |
| 26 | 75 | Inadequate Search |
| 27 | 78 | Timeliness |
| 28 | 79 | Timeliness |
| 29 | 79 | Timeliness |
| 30 | 79 | Timeliness |
| 31 | 81 | Timeliness |
| 32 | 86 | Timeliness |
| 33 | 89 | Timeliness |
| 34 | 90 | Timeliness |
| 35 | 102 | Inadequate Search |
| 36 | 117 | Timeliness; Inadequate Search |
| 37 | 130 | Timeliness |

| | | |
|---|---|---|
| **38** | 131 | Timeliness |
| **39** | 133 | Timeliness |
| **40** | 140 | Timeliness |
| **41** | 158 | Timeliness |
| **42** | 161 | Timeliness |
| **43** | 182 | Timeliness |
| **44** | 185 | Timeliness |
| **45** | 187 | Exemptions |
| **46** | 189 | Timeliness |
| **47** | 195 | Timeliness |
| **48** | 196 | Timeliness |
| **49** | 209 | Timeliness |
| **50** | 220 | Inadequate Search |
| **51** | 233 | Exemptions |
| **52** | 252 | Timeliness |
| **53** | 256 | Timeliness |
| **54** | 276 | Timeliness |
| **55** | 281 | Exemptions |
| **56** | 285 | Timeliness |
| **57** | 312 | Exemptions |
| **58** | 373 | Timeliness |
| **59** | 383 | Timeliness |
| **60** | 414 | Timeliness |
| **61** | 441 | Inadequate Search |
| **62** | 478 | Timeliness; Exemptions |

*Source*: OIG analysis of FOIA Team data
*We calculated elapsed business days based on the date the requester submitted the FOIA request and the date the litigation was filed.

## Appendix F
## Office of Special Reviews and Evaluations Major Contributors to This Report

Tatyana Martell, Chief Inspector
Carie Mellies, Lead Inspector
Ian Stumpf, Inspector
Avery Roselle, Attorney Advisor
Paul Lewandowski, Independent Referencer

# Appendix G
# Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office for Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Privacy Office Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees
Senate Homeland Security and Governmental Affairs Committee Permanent Subcommittee on Investigations

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.

## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305